881 A.2d 1180

**Deepa GARG**

v.

**Ajay K. GARG.**

**No. 1707, Sept. Term, 2003.**

Court of Special Appeals of Maryland.

Sept. 2, 2005.

548

Richard D. Rosenthal (Ferrier R. Stillman, Tydings & Rosenberg, L.L.P., on the brief), Baltimore, for Appellant.

Stephen J. Cullen (Jeffrey M. Geller, Miles & Stockbridge, P.C., on the brief), for Appellee.

Panel: MURPHY, C.J., HOLLANDER, and CHARLES E. MOYLAN, JR. (Retired, specially assigned), JJ.

HOLLANDER, Judge.

This divorce and child custody case involves events that occurred in India as well as Baltimore County. The Circuit Court for Baltimore County dismissed a complaint for limited divorce, custody, and child support filed by Deepa Garg, appellant, against Ajay Garg, appellee, because it concluded that the court lacked jurisdiction under the Maryland Uniform Child Custody Jurisdiction Act (the "UCCJA"), § 9–201 *et seq.*

of the Family Law Article ("F.L.") of the Maryland Code (1999 Repl. Vol.).[1] Thereafter, the court awarded travel costs and attorney's fees to Mr. Garg.

On appeal, Ms. Garg poses the following questions:

I. Was the trial court in error in applying the international application of the Uniform Child Custody Jurisdiction Act to dismiss mother's complaint for custody where the foreign nation had not issued an order or decree concerning custody?

II. Was the trial court in error in dismissing mother's complaint for custody in contravention of the Family Law Article 1–201(a)(5) and (b)(1) and 2–503(d) granting the trial court jurisdiction over the issue of custody?

III. Was the trial court in error in dismissing Wife's complaint for divorce for alleged insufficient service of process[?]

IV. Was the award of attorney's fees and expenses entered in error an abuse of discretion?

For the reasons set forth below, we shall vacate the dismissal and remand for further proceedings.

## FACTUAL AND PROCEDURAL SUMMARY

The parties were married in India on July 19, 1991. Mr. Garg is a citizen of India, where he now resides. At one time, however, he was a permanent resident of the United States. Ms. Garg claims she came to the United States as a "lawful permanent resident" in October 1991, and she became a naturalized United States citizen in 1997. The couple's only child, Chaitanya, was born in India on September 23, 1995. Appellant claims that Chaitanya is an American citizen, pursu-

---

1. Effective Oct. 1, 2004, the UCCJA, F.L. §§ 9–201 through 9–224, was repealed by Ch. 502, Acts 2004. The provisions are now codified in Title 9.5 of the Family Law Article and are known as the "Maryland Uniform Child Custody Jurisdiction and Enforcement Act," or "UCCJEA." We discuss the UCCJEA, *infra*.

ant to the Child Citizenship Act of 2000, 8 U.S.C. § 1431(a) (2000).[2]

According to appellant, Mr. Garg remained in the United States when the couple's child was born. Ms. Garg and the baby returned to this country in January 1996. The family then resided in Massachusetts until 1999.

The parties separated in March 2002, while they were again in India. In April 2002, Mr. Garg initiated custody proceedings in Indore, India, pursuant to the Guardians and Wards Act. In the same month, appellant filed an action for "maintenance" in Mumbai, India, pursuant to the Criminal Procedure Code. In May of 2002, when Ms. Garg left India with the couple's son, no custody order had been issued by an Indian court. The pair arrived in Maryland on May 24, 2002.

Nine months later, on February 24, 2003, appellant filed in the Circuit Court for Baltimore County a "Complaint for Limited Divorce, Child Custody, Child Support and Appropriate Relief." She alleged that appellee's "conduct frequently included . . . assault and battery," spanning approximately ten years of marriage. Moreover, appellant claimed that she was "unaware of any other action pending in this or in any other state, territory, country or jurisdiction for the divorce, separation, annulment or dissolution of the marriage of the parties. . . ." She also alleged that it was in the best interest of the child to remain in her custody, because of the physical and emotional harm inflicted on him by appellee, and because Chaitanya did not want to return to India.

---

2. The statute provides, in part:

A child born outside the United States automatically becomes a citizen of the United States when all of the following conditions have been fulfilled:

(1) At least one parent of the child is a citizen of the United States

. . .

(2) The child is under the age of eighteen years.

(3) The child is residing in the United States in the legal and physical custody of the citizen parent pursuant to a lawful admission for permanent residence.

Two weeks later, on March 7, 2003, Ms. Garg filed an "Ex Parte Motion For Emergency Custody." She advised the court that appellee "filed for custody [of Chaitanya] in his home country (India)" and that "the Indian court has accepted jurisdiction over the matter. . . ." However, she asserted that the Indian court "does not have personal jurisdiction" of appellant or the child.

On the same date, the court (Levitz, J.) issued a "Ruling" denying the motion "because notice was not provided as required under Rule 1–351." But, the court also ruled that appellee "is prohibited from removing the minor child, Chaitanya Garg, from· the jurisdiction of [the] court before such time as a hearing is held regarding [the] matter."

Appellant filed an amended ex parte emergency custody motion on March 18, 2003, claiming that she notified appellee in accordance with Md. Rule 1–351. Appellant asked the court to award her sole legal and physical custody of Chaitanya, "with a prohibition that the minor child not travel domestically or abroad without the [appellant's] written permission, or that of [the] Court." Appellant included a copy of an "Intimation of Ex Parte Order" from the Family Court in Indore, dated February 1, 2003, addressed to Deepa Garg. It advised that appellee's custody matter "proceeded Ex–Parte against you" because Ms. Garg's "advocate," Shri Gangwal, "pleaded 'No Instructions' on 26.8.2002." [3]

In response to appellant's complaint and ex parte custody motion, on April 11, 2003, appellee filed a "Verified Emergency Motion to Dismiss Pursuant to Maryland Uniform Child Custody Jurisdiction Act Because Custody Proceedings Are Pending in India." [4] He alleged that appellant "abducted" Chaitanya from India to Maryland, and complained that she

---

**3.** In later correspondence and court documents, appellant's attorney is identified as V.K. Gangwal. We assume that the names refer to the same individual. We also observe that the date of 26–8–2002 is August 26, 2002.

**4.** In this motion, as in all other submissions, appellee stated that he was not submitting to the personàl jurisdiction of the court.

"fraudulently concealed" from the court that custody proceedings were already pending in India. In his view, appellant's conduct constituted a "reprehensible attempt to forum shop improperly."

According to appellee, the court in Indore had jurisdiction of the custody dispute as of April 8, 2002, when he sought an expedited hearing pursuant to Section 25 of the Guardians and Wards Act. In support of his contention, appellee attached a translated copy of his "Application [to the Indian court] for Early Hearing in Case No. 8/02." He also attached a copy of the Indore court's decision of July 11, 2002, denying appellant's motion to dismiss his custody action on the ground that the Indore court lacked jurisdiction because Chaitanya lived in Mumbai. Further, Mr. Garg asserted that, "on August 26, 2002, Ms. Garg's [Indian] counsel advised the court that he was without instructions from his client as to how to proceed," and the Indore court thereafter "initiated ex parte proceedings."

According to appellee, on October 23, 2002, "[t]he Indian court . . . issued an order that Ms. Garg be informed that the case would proceed ex parte against her and continued the proceeding to December 19, 2002." [5] Appellee also alleged that "he pursued all legal notices ordered by the Indian court," and Ms. Garg was served in Baltimore with the ex parte order and documents from the Indore court on February 25, 2003.

In addition, appellee attached a copy of a letter dated April 6, 2002, from the child's Indian school, stating that appellant had removed Chaitanya from the school on March 22, 2002. He also appended a copy of a letter dated April 12, 2002, from appellant to Chaitanya's school in Indore, in which appellant stated that she took her son to Mumbai "in an emergency" and that she planned to "return back to Indore soon; but he

5. The record reflects that the proceedings set for December 19, 2002, were subsequently postponed to February 25, 2003, because "ex parte information sent to [appellant] has been received with the remarks that [she] does not stay at the said address."

fell sick." In the letter, appellant also asked the school to issue a "school leaving certificate." Appellant enclosed a "medical certificate" with the letter, signed by Dr. Bharat Shah, stating that Chaitanya "was suffering from fever, gastro-enteritis, [and] dehydration since" March 26, 2002. Appellee alleged: "Upon information and belief, at some point thereafter, Ms. Garg removed the child from India and Mr. Garg then spent months looking for the child."

In view of the custody proceedings pending in India, and appellant's "wrongful removal and wrongful retention of [the] child ... in this state," appellee urged the court to dismiss Ms. Garg's action pursuant to the UCCJA. He argued that appellant could not "assert jurisdiction in Maryland because she has already appeared in Indian court, was represented by counsel there and is in the middle of custody litigation in that forum." Appellee insisted that India was the more appropriate venue because it was Chaitanya's "home state."

In addition, appellee maintained that, "because of the Indian court's insistence on substantive and procedural due process and notice to Ms. Garg and because Ms. Garg abducted the child during the pendency of the proceedings, there is no existing decree in India." Under § 9–208(a) of the UCCJA, however, he asserted that the circuit court was permitted to decline jurisdiction.[6] Among other things, appellee requested:

b. an Order directing that courts of the sovereign nation of India have exclusive personal and subject matter jurisdiction over the parties and the child and that Mr. Garg not be impeded from repatriating the child to India;

\* \* \*

d. an Order directing Ms. Garg to pay Mr. Garg's costs and attorney's fees; . . . .

---

6. F.L. § 9–208 provided:

**When court may decline jurisdiction.**

(a) *No existing decree.*—If the petitioner for an initial decree has wrongfully taken the child from another state or has engaged in similar reprehensible conduct, the court may decline to exercise jurisdiction if this is just and proper under the circumstances.

On April 28, 2003, appellant filed a request for an emergency custody hearing and a motion to strike appellee's motion to dismiss. She asserted "that there is an emergency because Mr. Garg has a history of violence against Ms. Garg and Chaitanya." Further, appellant averred that appellee had been "served with process on March 7, 2003," in East Hartford, Connecticut, where he "maintains an address" to receive "tax and brokerage statements."

Significantly, appellant agreed with appellee that she received a "Summons from Family Court, Indore, India with intimation of ex-parte order and notice on next hearing date" on February 25, 2003. However, she maintained that this date was one day after she filed her complaint in the circuit court.[7] In addition, appellant alleged that appellee "abandoned" her on March 21, 2002. She also claimed that, on March 28, 2002, she and Chaitanya traveled from Indore to Mumbai, and she then filed an action against appellee on April 1, 2002, seeking "maintenance" for herself and Chaitanya. However, she was unable to serve the "[s]ummons" on Mr. Garg.

According to appellant, she took steps to leave India beginning on April 1, 2002 (i.e., before appellee filed his custody case in India), when she sent an e-mail to the United States consulate "requesting help." Appellant visited the consulate on April 21, 2002, and received a duplicate United States passport on May 8, 2002. Several weeks later, she obtained for Chaitanya a "duplicate copy of Permanent Residents Card (Green Card) from the U.S. Consulate." Claiming that, at the time she left India, "she was not under any legal compulsion to remain in India or to relinquish custody of Chaitanya," appellant "vehemently object[ed] to Mr. Garg's characterization of her escape to safety as an attempt to forum shop."

Appellant attached as an exhibit a "Certificate" from her attorney in India, V.K. Gangwal, dated April 23, 2003. He

---

7. The Indian court held a hearing in this matter on the same date, February 25, 2003. Its records show that it was not yet aware of the service on appellant.

stated: "[I]n April 2002 Mrs. Deepa Garg had contacted me at Phone for my professional help in the matter of her having been deserted by her husband on 21/3/2002. . . ." Mr. Gangwal indicated that, on April 1, 2002, appellant filed a maintenance action against appellee "under the Criminal Procedure Code Section 125 in the family court at Mumbai. . . ." According to Gangwal, because appellee had not received a summons in that action, the case had not "started." Notably, he represented that appellant left India in May 2002, without knowledge of appellee's pending custody action in India.

Therefore, appellant urged the court to assume "exclusive jurisdiction" over the parties and the child, on the ground that "Maryland is Chaitanya's home state and . . . the most convenient forum to litigate this dispute." She insisted that the court was entitled to decide whether it had jurisdiction, given the strong evidence that it could be physically and emotionally harmful to the child to surrender him to appellee. In support of her argument that Maryland is Chaitanya's home state, appellant reiterated that Chaitanya is a United States citizen.

The docket reflects that on April 28, 2003, the same date that appellant filed that motion, the request was denied by "JGT." [8] Thereafter, on May 2, 2003, appellant filed a Motion to Appoint Counsel for Minor Child. Citing F.L. § 1–202, she expressed concern for the child's "health, safety and welfare." Appellee opposed that motion, arguing that, in view of the conflicting motions concerning jurisdiction, "it would be premature . . . for this Court to consider the appointment of counsel for the child."

On May 6, 2003, pursuant to Md. Rule 2–322(a)(4), appellee moved to dismiss appellant's action "in its entirety for insufficiency of service of process." Claiming that he has never resided in Connecticut or Maryland, appellee argued that service of process was improper under both Maryland and Connecticut law.

---

8. We assume that "JGT" refers to Judge John G. Turnbull, III.

Shortly thereafter, appellee filed an opposition to appellant's motion to strike his motion to dismiss, reiterating that the circuit court lacked jurisdiction because the Indian court had already assumed jurisdiction. According to appellee, because appellant was represented by counsel in the Indian court, she could not attempt to evade jurisdiction in India by bringing an action in Maryland. Appellee asserted that India was Chaitanya's home state, and appellant could not "create home state jurisdiction through her own illegal actions," such as "abduct[ing]" the child from India and bringing him to Maryland. In his view, the Indian court was a more appropriate forum to hear the parties' disputes, because "all of the substantial evidence concerning the child's present and future care, protection, training and personal relationships is more readily available in India than in Maryland. . . ."

Mr. Garg also alleged that appellant was aware of pending custody proceedings in India when she filed her complaint in Maryland. He claimed that she initiated suit in Maryland "when she realized that her concealment of the child in this State had been discovered." Further, he alleged that appellant fabricated "allegations of abandonment, neglect or abuse . . . to usurp the proper jurisdiction of the Indian court and conceal her own illegal actions before this Court."

On June 17, 2003, appellant filed "Plaintiff's Opposition to Defendant Ajay K. Garg's Motion to Dismiss and Plaintiff's Opposition to Defendant's Motion to Not Appoint Counsel for Minor Child." Appellant renewed her request for the appointment of legal counsel for Chaitanya, and reiterated that Maryland is the child's home state. She also contended that, in an Order of March 21, 2003, "the Family Court in Indore, India, itself has objected to Mr. Garg's claimed submission for want of jurisdiction." In support of appellant's challenge to the jurisdiction of the Indian court, she submitted a copy of her "Application of the Defendant [i.e., appellant here] Raising Preliminary Objections on the Maintainability and the Jurisdiction filed on May 21, 2003 in the Family Court, Indore, Guardian Case No. 8/2002."

In addition, appellant reiterated that she and the child were abused by appellee, and claimed that she fled India only "after repeated pleas to relevant authorities went unanswered." In support of her abuse allegations, appellant submitted affidavits from her parents, Veejay Kumar Govil and Adarsh Govil.[9]

In response to appellee's claim that appellant had engaged in forum shopping, appellant noted that her action in India was only for "maintenance," which "is akin to a living allowance," while the action in Maryland was for divorce and custody. She characterized appellee's allegations of improper service as "spurious."

On July 7, 2003, the court (Fader, J.) issued a "Memorandum to Assignment" with regard to scheduling a hearing on appellee's two motions to dismiss (one submitted April 28, 2003, claiming lack of jurisdiction, and one submitted May 6, 2003, claiming improper service of process). The court stated:

First, there is no emergency. This is because Judges Levitz and Turnbull have said there is no emergency though everything both parties have filed cry "emergency."

Second, in the Motion to Dismiss, there are all sorts of allegations of removal from the jurisdiction, concealment of facts, etc. which, in a contested domestic case, must be subject to in-court testimony.

Third, the Motion to Appoint Counsel for Minor child (5/03/03) just sits until the attorney filing the motion complies with the procedural responsibility to have the matter directed to the Judge of the Family Division assigned to hear these motions regarding appointment of counsel on a rotating basis as the Bar [h]as so been informed.

Thereafter, on September 3, 2003, the court (Dugan, J.) issued a "Ruling" stating that appellant's motion to appoint counsel for Chaitanya would "be held in abeyance by the court until after Judge John F. Fader, II rule[d] on the issue of jurisdiction."

---

9. At the hearing, discussed *infra*, Mr. Govil spelled his name "Veejay." However, in his affidavit, the name is spelled "Vijay."

The court (Fader, J.) held an evidentiary hearing on September 23, 2003, at which numerous witnesses testified. At the outset of the hearing, the court stated: "We are here today just on the jurisdiction issue, namely whether or not a court in India should have jurisdiction of this case or whether the Circuit Court for Baltimore County will have jurisdiction of this case." During the parties' opening remarks, the court set forth its understanding of the UCCJA as it applied to the case at bar. The following colloquy is pertinent:

[COURT]: *Well, here is my understanding of the law. The Uniform Child Custody Act is applicable not only between states but with regard to foreign countries. Is there any disagreement with that?*

[APPELLANT'S COUNSEL]:[10] *There is no disagreement.*

[APPELLEE'S COUNSEL]: No, Your Honor.

[COURT]: *Number 2, the state where the action is first filed is the one that gets to determine first whether it has or it will keep jurisdiction.*

[APPELLANT'S COUNSEL]: *That is correct, Your Honor, assuming that due process was indeed followed in that state when it was filed.*

[COURT]: Let me say this. Number 3, the only time that I can take jurisdiction is number 1, if there is an emergency then without them determining that they will take jurisdiction first.

Now, there is a second exception to that and that second exception is is this a country with laws that parallel those of the State of Maryland? In other words, can that court or will that court be on the same basis with regard to the law or substantially the same law? In other words, we are not going to have much reciprocity with Islamic countries because Maryland says there is no preference for a parent where Islamic law says there is. So we are not going to honor them. We know daggone well they will not honor us.

---

**10.** Appellant's counsel at the hearing is not her current counsel.

▌

Once again, I state to you my understanding of the law is that India has the right, first of all, to determine whether it shall keep jurisdiction and there are only two exceptions applicable here: Exception Number 1 is an emergency power, is this child in danger because of the fact that there has been abuse by the father or something; or secondly, because the laws of India do not substantially comport with the laws of that State of Maryland so as to allow them to exercise jurisdiction.

Let me stop there and ask you do either of you have a problem with that? That is the only two exceptions I know.

[APPELLANT'S COUNSEL]: Your Honor, there is also another exception, which may not be an exception.... The home state of this child has been here for over fifteen months, he has established relationships here, and has been registered in school, all the health care records of the child—the child has spent—

[COURT]: That is the second step. The first step is that the jurisdiction where it is first filed is the one that determines whether it has and will keep jurisdiction first.... The home state doesn't come into that at this time because that jurisdiction would be the jurisdiction to decide whether it is the home state.

(Emphasis added).

Appellant testified that appellee returned to India in May of 2000. Prior to that time, he worked in Northboro, Massachusetts as a senior research officer for Norton Company.[11] She claimed that she left India, in part, because she was not allowed to work there, in light of her status as a United States citizen. Ms. Garg also maintained that Mr. Garg "repeatedly" abused and mistreated her and Chaitanya.

[APPELLANT'S COUNSEL]: ... Now, can you recall any specific instances of this abuse?

---

11. According to Ms. Garg's chronology of events, she and the child left for India in July 1999, and Mr. Garg remained in the United States until May of 2000.

[MS. GARG]: Yes, sir. Right from the beginning of the marriage from 1991, there was a history of abuse from Mr. Ajay Garg and his parents towards me right after the marriage and it was regarding dowery. And this just kept on escalating. It was there in '91, the abuse was there in '93, the abuse was there in '95 and then my son was born. After my son was born it was in front of my little son. My son was so little, he could hardly speak. But at that time he had to witness all the beatings, the spittings where I was subject to the verbal abuse I was put through and whatever. I was put in such a position that each day I was put down saying that you ought to be a true Hindu wife, stay at home, go nowhere and just be at home.

\* \* \*

After I got back to India ....for a month or two everything seemed fine, but then things started going wrong. His parents would take fault with everything I and my son did. They wanted us there it seemed but it didn't show. They lacked emotion towards me; they lacked emotion towards my son....

[APPELLANT'S COUNSEL]: So there were instances where the child was physically beat?

[MS. GARG]: Yes, sir.

\* \* \*

[APPELLANT'S COUNSEL]: Secondly, you also are saying there were instances where that child was starved on purpose?

[MS. GARG]: Yes, sir, he was starved on purpose. Suppose if they didn't like anything I said to them or if they did not agree with me, they know the only thing that could get back to me was through this child of mine. They would starve him. I was in such emotional—first of all, I am in a foreign country; I did not have access to the money, did not have access to the telephone there. My parents, though they were in India, I could not see them; I was not allowed to. It was a very isolated situation. And my son being with me could not go anywhere. I had to protect my son.

When they knew that my son was my weakness, I would do anything to protect that little boy. That day and every day, they knew anything they did to him, they could get to me.

[APPELLANT'S COUNSEL]: Okay. Did you report any of this abuse to Indian authorities?

[MS. GARG]: I did, sir, later, but they seem not to care of the fact that I was not an Indian citizen.

With regard to appellee's "abandonment," appellant stated: "I was totally in fear of my and our son's life. . . . He had threatened to kill both of us. He said, 'I don't come back. I have left you, I have dropped you, I don't want you, you are not my wife.' And he put us there as if we were like a dirtbag."

Appellant also claimed that when Chaitanya wet his bed, appellee "threatened to burn him the next time he would do that." Appellant also testified that, on another occasion when Chaitanya wet his bed, appellee "took a big lock and tied it up with the draw strings [to Chaitanya's shorts] and [Chaitanya] was so small at that time he couldn't walk because of the weight of the lock and he came to me and said that daddy has done this." On cross-examination, appellant admitted that she did not have any police records of domestic complaints in regard to her husband's alleged abuse, either in the United States or in India.[12]

Appellant testified that she initiated a suit against appellee in Mumbai for maintenance, for which she retained Gangwal, because she "needed money." Appellant explained:

I was in a foreign country, I had needs to take care of that little child, I had my own needs to take care, I had passport fees, other fees; I had transportation costs. So I filed a suit in Bombay and I retained Mr. Gangwal only to liason

---

12. Appellant had attached to her complaint copies of reports that she and her father made to the Indian police in March and April of 2002, alleging abuse by appellee. However, these were not offered into evidence.

between the Bombay Court. I thought it would facilitate me getting money in my suit from my husband because he is from Indore too. That is what my understanding was. . . .

We were both hungry. We had our needs daily. Life had to go on in spite of everything. So I needed money in a foreign country. I had to feed that child. I could not allow him to suffer. I could not see him be without his basic needs of food, clothing and shelter.

Appellant maintained that she "only became aware" of appellee's custody suit "when [she] was issued an ex parte order on the 25th February [of 2003]. . . ." The Indore court held a hearing on the same day that appellant received notice in the United States, i.e., February 25, 2003. Appellant's testimony established, however, that by the time she was served on February 25, 2003, it would have been February 26, 2003, in India. In effect, then, appellant received notice *after* the hearing in India.[13]

Moreover, appellant testified that she notified the circuit court of the pending custody action in India when she learned about it. She referred to a letter from her counsel in India, stating:

Mrs. Deepa Garg had left India on Indian dates 24/5/2002 [i.e., May 24, 2002] and up to that time there was no case known to Mrs. Deepa Garg filed by Mr. Ajay Garg against her. Later on I learned Mr. Ajay Garg had filed a case number NJY–8–2002 dated in Indian dates 8–4–2002 in Indore District Court, M.P., India against Mrs. Deepa Garg for obtaining the custody of child Chaitanya Garg. Summons is published in newspaper on 9–6–2002 Indian dates. *I was unable to contact Mrs. Deepa Garg. I told the Indore M.P. Court about no instruction on Indian dates 26/8/2002 and*

---

13. Appellant's testimony is supported by Joint Exhibit 1, which is a "Translation in English of Court Proceedings (Original in Hindi"). It contains a chronology and a description of proceedings in the Indore court. Of import here, it shows that on February 25, 2003, appellant's notice was "not received delivered/undelivered copy of the notice. . . ."

*the Court passed an order to proceed ex parte. I had not been [able to] communicate to Mrs. Deepa Garg because her address was not known to me.*

(Emphasis added).

Appellant denied that Gangwal was her attorney in regard to the Indore proceedings in July 2002. The following colloquy is pertinent:

[APPELLEE'S COUNSEL]:. . . . Now, after April 2002 and after you were in Mumbai, the Indian case had a hearing in July 2002 where you had an attorney representing you, correct?

[MS. GARG]: No, sir.

[APPELLEE'S COUNSEL]: Okay. Let me show you joint Exhibit Number 1 [a certified copied of Indian court orders] and specifically in the translation, the 11th of July, 2002. Do you see that?

[MS. GARG]: Yes, sir.

\* \* \*

[APPELLEE'S COUNSEL]: If you go to the 11th of July, 2002, it has "Shri Prasanna Bhatnagar for the Plaintiff;" do you see that?

[MS. GARG]: Yes, sir.

[APPELLEE'S COUNSEL]: "Shri Gangwal, Advocate for the Defendants;" do you see that?

[MS. GARG]: Yes, sir.

[APPELLEE'S COUNSEL]: Mr. Gangwal is your attorney in India, isn't he?

[MS. GARG]: I did not tell him. I asked him to liason between the Mumbai Court and since he was from Indore and my husband is from Indore, so I asked him to be a liason between the files in Mumbai and I do not know what advantage he took of that, sir.

[APPELLEE'S COUNSEL]: So you are not denying that on July 7th—July 11th, 2002, Mr. Gangwal appeared on your behalf in the Indian Court in Indore, correct?

[MS. GARG]: I don't know what he did, sir.

The following exchange is also pertinent:

[APPELLEE'S COUNSEL]: Okay. Now, last question relates to Joint Exhibit Number 1 [certified copies of Indian court orders] again. You see we are back to July 11, 2002; do you see that?

[MS. GARG]: Yes, sir.

[APPELLEE'S COUNSEL]: You will see that there is an argument made by Mr. Gangwal in this court hearing where he says that "it is clear that the minor, Chaitanya, ordinarily resides in Mumbai[,"] do you see that?

[MS. GARG]: I do see that, sir.

[APPELLEE'S COUNSEL]: If you didn't have any communication with Mr. Gangwal, how could he possibly know that you were in Mumbai?

[MS. GARG]: When I was in Mumbai, I told him the case I started in Mumbai and I asked him to act as a liaison. I don't know what he did from there.

Appellant explained that she was unaware of an "ongoing custody case" in India when she filed her circuit court case. The following exchange is pertinent:

[APPELLEE'S COUNSEL]: Tell His Honor, please, where in that paragraph [of the Complaint] do you identify for the Court that there is an ongoing custody case in India?

[MS. GARG]: There was no ongoing custody case at that time.

[APPELLEE'S COUNSEL]: Okay. So your testimony, so we are clear, is that you had no knowledge of the proceedings in India started in April 8, 2002 where Mr. Gangwal appeared as your attorney on the 11th of July, 2002, is that right?

[MS. GARG]: Yes, sir.

Appellant added: "I have rectified the mistake in my later pleadings.... At no point in India did I ask for limited divorce, child custody; the case in Mumbai was for maintenance."

Appellee testified that he works for a software company doing "quality assurance." He acknowledged that, without appellant's "permission" or her participation in the decision, he surrendered Chaitanya's green card in August of 2002 to the U.S. Embassy. When asked about the "significance" of that decision, he responded that it meant that the "child does not have immigration status at this time in USA.... [T]he status has been abandoned and he is out of status in this country." Appellee added: "In my opinion he is illegally in this country...."

Mr. Garg also voluntarily surrendered his "green card" to the U.S. Consulate on September 10, 2003.[14] Previously, he came to the U.S. on January 2, 2003. The following exchange is pertinent:

[APPELLANT'S COUNSEL]: If you were in the United States in general in 2003, having known where your child was, what effort did you make to see your child?

[MR. GARG]: I[am] patiently waiting for the due process of law and the Indian court to give me some sort of order of relief so I can meet my son. And I have taken the law in my hand to initiate any contact with my my son even though it breaks my heart.... It breaks my heart not having seen my son for eighteen months....

Further, appellee described the demise of his marriage and his poor relationship with Ms. Garg's parents. He denied that he made any dowry demand on Ms. Garg or her family. He also acknowledged that he drove appellant from their family home to her relative's house, and claimed that he visited with her and Chaitanya at the relative's home.[15]

---

14. Appellee confirmed that he receives brokerage statements at a friend's house in East Hartford. He also testified that he uses the same address in Connecticut for filing "global income taxes."

15. Appellee repeatedly asserted difficulties with English as a second language. The difficulties are not readily apparent, however, as the following exchange illustrates:

[APPELLANT'S COUNSEL]: You admitted to this court earlier that you dropped off the wife at her residence?

In his portion of the case, Mr. Garg offered additional testimony detailing his frustration with his inability to procure Ms. Garg's presence at the court proceedings in India. He also described the steps that the Indian court took to provide Ms. Garg with notice of the custody action in that court. Appellee acknowledged, however, that Ms. Garg was not represented by "an advocate" at the "initial" hearing.

Mr. Garg vigorously denied that he ever abused his wife or child. He stated: "I never threatened to burn my son. I love him with all my heart and all my life." The following exchange is pertinent:

[APPELLEE'S COUNSEL]: On how many occasions have you threatened to kill your wife?

[MR. GARG]: Zero.

\* \* \*

[APPELLEE'S COUNSEL]: How any times have you spat in your wife's face?

[MR. GARG]: Zero.

[APPELLEE'S COUNSEL]: How many times have you locked your child's pants together with a padlock?

[MR. GARG]: Zero.

Chandra Kumari Krishna Chellappan, an Indian lawyer, testified on behalf of appellant.[16] She stated that because appellant and appellee are both Hindus, Mr. Garg's custody

---

[MR. GARG]: I do not remember admitting that to this court that I dropped her there. Again, English being a second language, does drop mean that I physically picked her and dropped her forcefully? If that your question?

[APPELLANT'S COUNSEL]: No. My question is you took your wife to her residence, correct? Yes or no?

[MR. GARG]: Again, I have a question with language. I can tell you if this answers the question. Is that when she was living—I was extremely worried and concerned about her, that she might do something to herself or whatever, and I offered her my car for which she asked and I drove the car together. No matter how much that answers your question.

16. It does not appear that Chellappan was formally received as an expert.

action in the Indian court should have been filed under the Hindu Minority and Guardianship Act of 1956. Ms. Chellappan also opined that appellant did not receive due process in appellee's custody action in the Indian court, because "these notice [sic] was not posted at all for the services concerned and it was not filed under the proper act."

With regard to parental preferences under the Hindu Marriage Act, the following colloquy is relevant:

[COURT]: Ma'am, here is the question. We have in the State of Maryland an equal protection clause. Now, that means by constitutional law there can be not be [sic] when there is a custody dispute any preference for the mother as opposed to the father or father as opposed to the mother. Does India have a law indicating that or is it as the Islamic law, that there is a preference for one parent or the other?

[MS. CHELLAPPAN]: Here I can just say that act evidently doesn't say anything. But of course the Hindu Minorities and Guardianship Act, when it is enacted it says that the welfare of the child is the paramount importance.

[COURT]: So it doesn't matter whether it is tried under the Hindu Act or the Marriage Act, it is the best interests of the child and there is no preference?

[MS. CHELLAPPAN]: No. The preference comes later. When you are taking the welfare of the child, take into consideration in Hindu marriage, the reason I said that is it should be properly filed under Hindu Marriage Act.

\* \* \*

[COURT]: Let me put it to you this way. If these two people were both living in Virginia and they tried this case before me and I said I'm giving a preference to the mother, the Court of Appeals would reverse me and say you can't do that. If they would say I'm giving a preference to the father, they would say you can't do that; is there any preference in Indian law?

[MS. CHELLAPPAN]: No, there is no such thing—

[COURT]: Is there any preference in Hindu law?

[MS. CHELLAPPAN]: No, there is no such preference.

Appellant's brother, Manind Govil, a Maryland resident, testified that he witnessed appellee abusing Chaitanya by pinching and shaking the child to stop him from crying. Veejay Govil, appellant's father, testified that he observed appellee abusing appellant "on many occasions." He also stated that appellee frequently called appellant "naukrani," which means "slave." Further, he claimed that he witnessed appellee pinching the child.

Shashikala Warrier, a licensed attorney in India with a Master's degree obtained in the United States in the field of international human rights, testified for appellee regarding Indian law.[17] She stated that she was familiar with the custody action that appellee filed in India. In her view, he properly proceeded under the Guardians and Wards Act. According to Ms. Warrier, the statute has "[n]o paternal preference.... The test is the paramount interest of the child. There is no other preference that is given." The following testimony is pertinent:

[COURT]: ... Does India Common Law or statutory law as it exists today have any provision for deferring to a religious—in other words, suppose he would go back to the court and he would say I'm claiming under Hindu law. Does Indian law then say, okay, we defer to Hindu?

[MS. WARRIER]: Not under the Guardians and Wards Act. Well, unless he has proceedings that are totally separate.

[COURT]: But you see, he can dismiss these proceedings and start all over again under the Hindu law.

[MS. WARRIER]: No. Even as it is today, it does not have any preference for the father or the mother.

[COURT]: How can you prove that for us?

[MS. WARRIER]: Because we have a whole container of judgments that are not favoring anyone except for the best interests of the child.

---

**17.** It does not appear that Ms. Warrier was formally received as an expert witness.

Ms. Warrier also opined that Indian law provides parties with adequate notice to satisfy due process. Further, she testified that appellant's known address was "pasted" by the Indian court authorities with a notice of pending custody proceedings.

At the conclusion of the hearing, the court said: "[T]he issue as far as is there a preference, maternal or paternal, the answer is no. Both experts have testified there is none." The court stated:

[THE COURT]: Look, the long and short of it is I'm not convinced there has been any abuse. I have looked at this lady and listened to her testimony. She is cool, she is calculating, she makes up her mind what she wants to say when she wants to say it and I believe—I don't believe her; I believe that most of the stuff she has made up to get her way.

As far as the father is concerned, there may have been a little pinching. I don't know what the custom is back in India, but if I catch you while you are in this country pinching that child, you are dead meat. Do you understand that, in American and in Indian?

[MR. GARG]: Yes, sir.

The court then "dismissed" the entire case, adding: "Any costs are to be paid by the mother of the child." The court reasoned:

First of all, as I said previously, I am not convinced that there was any abuse of any magnitude except the pinching because I do not accept her testimony or any of her witness' testimony to that effect.

Second, I am convinced, because the witness for the mother and the witness for the father both say there is no maternal or paternal preference under Indian law, whether it be from Indian Common Law or either the Guardians and Wards Act of 1890 or the Hindu Minority and Guardianship Act of 1956 pursuant to Maryland's recognition of Foreign Law Act.... So there doesn't seem to be that out there to

cause Maryland to say that the laws of another country are so far against its public policy that we will not enforce them.

Thirdly, the Indian court seems to feel it has jurisdiction. It says that implicitly in its rulings. From what I see, the service aspects comport with due process of this country and, more importantly, an attorney has entered his appearance for her submitting the attorney and her to the jurisdiction of the Indian court.

\* \* \*

[T]here certainly has been no testimony to overcome that presumption that she has submitted herself to the jurisdiction of the Indian court and has in fact also been properly served there.

Fourth, I am not convinced that there is any neglect or failure by the father to support his child in India or to care for his child in India as has been testified to by the mother of the child.

Fifth, I hear time and time again that she has overwhelming fear. If she does, she has manufactured that fear herself based upon a base of disappointment with the man she married and the man her father agreed she would marry. Her fear, not based on any other facts other than disappointment, is not something that I can or should consider.

Sixth. As to the Uniform Custody Act, which is not only applicable among the states who have co-signed that act but also between the United States of America and I don't know what the proper term is for the Indian government, the Government of India. . . .

\* \* \*

The evidence is clear that somehow there was problems [sic] in this case while these people were in India over this child so much so that the father files suit on 4–6–02 to have India adjudicate that. India never had a chance to because she spirited that child out of India for no reason. And even though she indicates now that this country is the home state for six months or more and *it is true that that child has been a resident of America for longer than six months, her*

*spiriting the child away, her committing a fraud on the Court by removing the child means that that home state preference and designation is not to be given.*

Everything before me indicates that India and their laws and the procedure in the court was at least as good to adjudicate this matter as the Circuit Court for Baltimore County.

(Emphasis added).

The court subsequently signed an Order on September 29, 2003 (docketed October 1, 2003), dismissing "the above-captioned case ... for the reasons stated on the transcript attached hereto. . . ."

On October 3, 2003, appellee filed a "Motion to Charge [Appellant] for Necessary Expenses and Trial Fees Following Dismissal of Case." He argued that, under the UCCJA, the court may assess appellant "with necessary travel and other expenses, including attorneys' fees, incurred by Mr. Garg or his witnesses." Appellee claimed travel expenses of $2,114.51, $1,200 in expert witness fees, and $2,000 in attorney's fees, for a total of $5,314.51. Appellee also attached copies of pertinent receipts and invoices.

On October 9, 2003, appellant noted an appeal to this Court from the court's Order of October 1, 2003. On the same day, she filed a Motion to Alter, Amend or Revise Order of Dismissal, seeking to prevent appellee from removing Chaitanya from Maryland during the pendency of her appeal, along with a request for a hearing.[18]

Then, on October 16, 2003, appellant responded to appellee's motion to recover costs and expenses. She argued that, "[e]ven without determining if [appellee's] application to the court would be governed by statute or case law," the court should deny the motion because appellee "did not produce any evidence during the proceedings of the financial status and needs of the parties." Further, appellant argued: "It smacks

---

18. On that day, appellant's trial counsel withdrew his appearance, and appellants' current lawyers entered their appearances.

of litigation sandbagging for a party to seek fees and expenses *after the fact* when the required criteria must be adduced at the evidentiary hearing ... not after the conclusion and following the finality of judgment, especially when the case is on appeal." Moreover, appellant argued that appellee's motion "is beyond the jurisdiction of the court."

In response, appellee argued that, in light of the court's Order dismissing appellant's complaint, the court should not "enter any further orders with respect to the child until such time as any Indian custody order is registered for enforcement in this State." Furthermore, appellee contended: "Any order with respect to the exercise of further jurisdiction by this Court would be contrary to the substance and spirit of this Court's September 29, 2003 Order and contrary to the intention of the UCCJA."

On November 24, 2003, the court (Fader, J.) entered a "Motions Ruling," in which it denied appellant's revisory motion, without a hearing.

Appellee submitted an affidavit on January 9, 2004, attesting to the expenses outlined in his motion of October 3, 2003. On January 22, 2004, appellee's attorney filed an affidavit attesting to his services and the calculation of his fee.

Appellant filed another opposition to appellee's request for attorney's fees and expenses on January 20, 2004. She asserted that the term "state," as it is defined in F.L. § 1–101(e), does not include a foreign nation, and asserted that the Maryland UCCJA permits fees "under any section except Section 9–203, the International Scope of the sub-title...." Appellant averred: "Since the statutes of UCCJA permitting attorney's fees, section 9–207(g), 9–208(c) and 9–215(h), apply only when state action is implicated, not that of a nation, none of these apply directly and therefore no attorney's fees are permitted."

Appellant also maintained that, "under Family Law Article 9–203, attorney's fees are permitted ... if there is a proceeding 'to the recognition and enforcement of *custody decrees*—of "other nations[.]" ' " (Emphasis added). Because "there is no

'custody decree' in India, the 'other nation,' in this case," asserted appellant, "there is no proceeding to recognize or enforce the custody decree of the other nation." Moreover, appellant argued: "Under fee shifting statutes, the load star test [sic] is now required [and] the Movant must prove several items which are lacking in his Motion and, therefore, no award can be made for fees and expenses." She also argued: "Under the Family Law Article applicable to custody or visitation, before an award of fees can be made, the financial status of each party has to be determined as well as the reasonableness of maintaining or defending an action."

On February 23, 2004, the court (Cox, J.) held a hearing regarding the issue of expenses and attorney's fees. According to appellee, appellant was incorrect that the UCCJA was inapplicable with regard to attorney's fees because, under F.L. § 9–203, the UCCJA was intended to apply to "the international area." Appellee also contended that F.L. § 9–208, on which the court relied, specifically provided for attorney's fees upon dismissal of a case for lack of jurisdiction under the UCCJA.

Further, appellee argued that *Friolo v. Frankel,* 373 Md. 501, 819 A.2d 354 (2003), only applied the lodestar analysis to wage and hour law cases, not the UCCJA. Alternatively, he argued:

So, assuming the lodestar would apply, and given that the Court has reviewed the transcript, or Judge Fader's ruling in this case, Your Honor, the Court would be aware that this is a highly complex evidentiary hearing involving two experts who testified, and the parties and counsel and the Court had to understand the intricacies of the Hindu Minority Act and the Guardianship and Wards act of 1890 from India.

I would submit, Your Honor, seeking fees for the solid day that we were in Court, is appropriate, given the matters that I have set out in my affidavit.

Appellant argued that the definition of "state" in F.L. § 1–101(e) does not apply to foreign nations. Therefore, she

argued that India cannot be a "state," as that term is used in the UCCJA. Further, she claimed that, for purpose of an award of fees, in order for F.L. § 9–203 to apply, "you need a custody decree of the appropriate institution of the other nation. Here, there is no decree." Appellant also suggested that the court could not award a fee under another section of the Family Law Article, such as F.L. § 12–103(b), because "[t]here was no claim for this. And secondly, there is no evidence of it in the case . . . . even if there were, we have no evidence of financial status of a party."

Ruling from the bench, the court said:

I'll start with the fact that Judge Fader specifically mentions costs to be paid by the mother of the child. Whether he means sort of the usual costs versus the costs that were initially pled, it is not totally clear.

But I'll note in the original petition that there was a claim for these specific travel and other necessary expenses litigated here on the—when the motion to dismiss was filed.

Judge Fader made the ruling under [F.L. § ] 9–208(a), based upon the removal of the child and conduct he described in his memo.

And really, in my mind, the legal issue boils down to whether 9–203, whether that expands the provisions of this statute so that it applies not just to actions between states, or is limited in the way [appellant's counsel] argues, to actions seeking to recognize or enforce a custody decree of a foreign nation.

\* \* \*

Given that, I think that 9–203 allows this Court to allow generally the provisions of the subtitle. I think that the provisions of payment for cost [sic], or assessment of expenses and fees, under 208(c), do apply.

Therefore, I will enter a judgment in the amount that is set forth in the petition, because the travel expenses have been documented; and, while they were lengthy, very lengthy and very interesting and complex proceedings that took place in the United States, only the petition for fees

related to the days spent in Court, and I find those to be reasonable, so judgment would be entered for the costs and fees that were pled.

On February 24, 2004, the court issued a "Money Judgment Order" in the amount of $5,314.51 against appellant, granting appellee's motion for costs and attorney's fees. Thereafter, appellant noted a second appeal to this Court from the judgment awarding costs and attorney's fees.[19]

We shall include additional facts in our discussion.

## DISCUSSION

### I.

■ Appellant, a Maryland resident and a United States citizen, filed an action in circuit court seeking, *inter alia,* a divorce as well as custody of the parties' son. When appellant filed suit, no divorce proceedings were pending in India.

At the outset of the hearing on September 23, 2003, the court said: "We are here today just on the jurisdiction issue, namely whether or not a court in India should have jurisdiction of this case or whether the Circuit Court for Baltimore County will have jurisdiction of this case." After the court determined that India had jurisdiction of the custody case, the court dismissed appellant's entire case, including the divorce claim. Quite apart from any dispute as to custody, appellant was entitled to pursue her divorce action in the circuit court.

Because the court erred in dismissing the divorce action, we shall vacate the dismissal and remand for further proceedings. Upon remand, the court should resolve, *inter alia,* appellee's claim that he was not properly served with process.

We turn to the custody dispute.

---

19. In appellant's brief, she states that "the two appeals are consolidated." We did not find a formal consolidation order in the record.

## II.

As noted, appellant asked the court to appoint a lawyer to represent Chaitanya's interests. However, the court failed to do so.

F.L. § 1–202 provides, in part:

### § 1–202. Appointment of counsel for minor.

In an action in which custody, visitation rights, or the amount of support of a minor child is contested, the court may:

(1) appoint to represent the minor child counsel who may not represent any party to the action....

In light of the motion for appointment of counsel, the importance of the custody issue, and the recent enactment of the UCCJEA, we shall remand the case to the court for appointment of an attorney for the child. We explain.

The custody issue is a complex one, because the court must determine whether it is to be decided by an Indian court or a Maryland court. Moreover, the custody determination is of paramount importance, because resolution of the dispute will determine whether the child resides in India or the United States. In view of the gravity and complexity of the custody issue, we cannot characterize the hearing as a mere "early stage" of the proceedings.

The relevance of the child's position and the fundamental importance of counsel's role are underscored by the function of the child's counsel in an acrimonious custody dispute. To that end, Md.Code, F.L. § 1–202 authorizes the circuit court to appoint counsel for a child to provide the court with an "independent analysis" of the child's position. *John O. v. Jane O.*, 90 Md.App. 406, 436, 601 A.2d 149 (1992). Indeed, "[t]he purpose of § 1–202 is to afford the court an opportunity to hear from someone who will speak on behalf of the child." *Id.* at 435–36, 601 A.2d 149 (citation and internal quotation marks omitted). The statute thus recognizes that the interests and positions of the parents in these cases are not necessarily congruent with those of the children, and that the

child is entitled to an advocate who will champion the child's position. *See Levitt v. Levitt,* 79 Md.App. 394, 403–04, 556 A.2d 1162 (concluding that trial court should have appointed counsel for child in custody modification proceeding, although no party had apparently ever moved for appointment of counsel), *cert. denied,* 316 Md. 549, 560 A.2d 1118 (1989).

■ To be sure, Chaitanya was not a casual bystander in these proceedings. Yet, without the presence of counsel, his voice was not clearly heard. Through the questioning of witnesses, the introduction of evidence, and argument, a lawyer for the child would have had an important role in regard to the question of whether Maryland was a "home state," whether the circuit court was required to defer to the court of a foreign nation, whether other provisions of the Family Law Article applied, such as F.L. § 1–201, the best interests of the child, and the status and nature of the various proceedings in India.

Given that Chaitanya will be profoundly affected by the outcome of the case, fundamental fairness suggests that he should have had a lawyer to articulate his interest and to assist on the critical and complex issues that were determinative of his future. Because Chaitanya's interests were not represented below, and the outcome of the case will have a colossal impact on his life and that of his parents, we cannot overlook the failure to appoint counsel for him.

### III.

For the benefit of the court and the parties on remand, we shall address appellant's claim that the court erred in concluding that the UCCJA (now the UCCJEA) applies to foreign countries under certain circumstances. We discern no error.

At the time the court ruled on the custody claim, the Maryland UCCJA was in effect. However, the UCCJA, F.L. §§ 9–201 to 9–224, was repealed effective October 1, 2004, i.e., one week *after* the evidentiary hearing was held in this case on September 23, 2003. It was replaced by Title 9.5 of the

Family Law Article, the "Uniform Child Custody Jurisdiction and Enforcement Act" or UCCJEA.

The appellate briefs focus solely on the UCCJA, because that was the statute that was in effect when the custody issue was decided.[20] However, because the UCCJEA will apply on remand, we shall primarily focus on the revised statute. We begin with a review of some of the relevant statutory provisions.

Title 9.5, Subtitle 1 pertains to "General Provisions." F.L. § 9.5–101 provides:

### § 9.5–101. Definitions.

(d) *Child custody determination.*—(1) "Child custody determination" means a judgment, decree, or other order of a court providing for the legal custody, physical custody, or visitation with respect to a child.

(2) "Child custody determination" includes a permanent, temporary, initial, and modification order.

(3) "Child custody determination" does not include an order relating to child support or other monetary obligation of an individual.

(e) *Child custody proceeding.*—(1) "Child custody proceeding" means a proceeding in which legal custody, physical custody, or visitation with respect to a child is an issue.

(2) "Child custody proceeding" includes a proceeding for divorce, separation, neglect, abuse, dependency, guardianship, paternity, termination of parental rights, and protection from domestic violence, in which the issue may appear.

(3) "Child custody proceeding" does not include a proceeding involving juvenile delinquency, contractual emancipation, or enforcement under Subtitle 3 of this title.

(f) *Commencement.*—"Commencement" means the filing of the first pleading in a proceeding.

\* \* \*

---

**20.** The UCCJEA was in effect by the time the matter of fees was resolved.

(h) *Home state.*—"Home state" means:

(1) the state in which a child lived with a parent or a person acting as a parent for at least 6 consecutive months, including any temporary absence, immediately before the commencement of a child custody proceeding; and

(2) in the case of a child less than 6 months of age, the state in which the child lived from birth with any of the persons mentioned, including any temporary absence.

(i) *Initial determination.*—"Initial determination" means the first child custody determination concerning a particular child.

\* \* \*

(p) *State.*—"State" means a state of the United States, the District of Columbia, Puerto Rico, the United States Virgin Islands, or any territory or insular possession subject to the jurisdiction of the United States.

F.L. § 9.5–201 provides:

**F.L. § 9.5–201. When court has jurisdiction.**

(a) *Grounds for jurisdiction.*—Except as otherwise provided in § 9.5–204 of this subtitle, a court of this State has jurisdiction to make an initial child custody determination only if:

(1) this State is the home state of the child on the date of the commencement of the proceeding, or was the home state of the child within 6 months before the commencement of the proceeding and the child is absent from this State but a parent or person acting as a parent continues to live in this State;

(2) a court of another state does not have jurisdiction under item (1) of this subsection, or a court of the home state of the child has declined to exercise jurisdiction on the ground that this State is the more appropriate forum under § 9.5–207 or § 9.5–208 of this subtitle, and;

(i) the child and the child's parents, or the child and at least one parent or a person acting as a parent, have a

significant connection with this State other than mere physical presence; and

(ii) substantial evidence is available in this State concerning the child's care, protection, training, and personal relationships;

(3) all courts having jurisdiction under item (1) or (2) of this subsection have declined to exercise jurisdiction on the ground that a court of this State is the more appropriate forum to determine the custody of the child under § 9.5-207 or § 9.5-208 of this subtitle; or

(4) no court of any other state would have jurisdiction under the criteria specified in item (1), (2), or (3) of this subsection.

(b) *Exclusive jurisdictional basis.*—Subsection (a) of this section is the exclusive jurisdictional basis for making a child custody determination by a court of this State.

(c) *Effect of physical presence.*—Physical presence of, or personal jurisdiction over, a party or a child is not necessary or sufficient to make a child custody determination.

With regard to the international application of the UCCJA, F.L. § 9-203 is pertinent:

### § 9-203. International scope of subtitle.

The general policies of this subtitle extend to the international area. The provisions of this subtitle relating to the recognition and enforcement of custody decrees of other states apply to custody decrees and decrees involving legal institutions similar in nature to custody institutions rendered by appropriate authorities of other nations if reasonable notice and opportunity to be heard were given to all affected persons.

By comparison, F.L. § 9.5-104 of the UCCJEA provides:

### § 9.5-104. Child custody proceedings involving foreign countries.

(a) *Foreign country treated as state.*—A court of this State shall treat a foreign country as if it were a state of the

United States for the purpose of applying Subtitles 1 and 2 of this title.

(b) *Recognition and enforcement of child custody determination made by foreign country.*—Except as otherwise provided in subsection (c) of this section, a child custody determination made in a foreign country under factual circumstances in substantial conformity with the jurisdictional standards of this title must be recognized and enforced under Subtitle 3 of this title.

(c) *Applicability of title.*—A court of this State need not apply this title if the child custody law of a foreign country violates fundamental principles of human rights.

F.L. § 9.5–204 provides:

**F.L. § 9.5–204. Temporary emergency jurisdiction.**

(a) *Grounds.*—A court of this State has temporary emergency jurisdiction if the child is present in this State and the child has been abandoned or it is necessary in an emergency to protect the child because the child, or a sibling or parent of the child, is subjected to or threatened with mistreatment or abuse.

(b) *Effect of current custody determination if no previous determination has been made.*—(1) If there is no previous child custody determination that is entitled to be enforced under this title and a child custody proceeding has not been commenced in a court of a state having jurisdiction under §§ 9.5–201 through 9.5–203 of this subtitle, a child custody determination made under this section remains in effect until an order is obtained from a court of a state having jurisdiction under §§ 9.5–201 though 9.5–203 of this subtitle.

(2) If a child custody proceeding has not been or is not commenced in a court of a state having jurisdiction under §§ 9.5–201 through 9.5–203 of this subtitle, a child custody determination made under this section becomes a final determination if the determination so provides and this State becomes the home state of the child.

\* \* \*

(d) *Communication with other state court.*—(1) *A court of this State that has been asked to make a child custody determination under this section, on being informed that a child custody proceeding has been commenced in, or a child custody determination has been made by, a court of a state having jurisdiction under §§ 9.5–201 through 9.5–203 of this subtitle, shall immediately communicate with the other court.*

(2) A court of this State that is exercising jurisdiction in accordance with §§ 9.5–201 through 9.5–203 of this subtitle, on being informed that a child custody proceeding has been commenced in, or a child custody determination has been made by, a court of another state under a statute similar to this section shall immediately communicate with the court of that state to resolve the emergency, protect the safety of the parties and the child, and determine a period for the duration of the temporary order.

(Emphasis added).

F.L. § 9.5–206 of the UCCJEA states, in part:

### § 9.5–206. Proceeding pending in another state.

(a) *When other state more appropriate.*—Except as otherwise provided in § 9.5–204 of this subtitle, a court of this State may not exercise its jurisdiction under this subtitle if, at the time of the commencement of the proceeding, a proceeding concerning the custody of the child has been commenced in a court of another state having jurisdiction substantially in conformity with this title, unless the proceeding has been terminated or is stayed by the court of the other state because a court of this State is a more convenient forum under § 9.5–207 of this subtitle.

(b) *Inquiry before hearing as to proceeding in other state.*—(1) Except as otherwise provided in § 9.5–204 of this subtitle, a court of this State, before hearing a child custody proceeding, shall examine the court documents and other information supplied by the parties under § 9.5–209 of this subtitle.

(2) If the court determines that a child custody proceeding has been commenced in a court in another state having jurisdiction substantially in accordance with this title, *the court of this State shall stay its proceeding and communicate with the court of the other state.*

(3) If the court of the state having jurisdiction substantially in accordance with this title does not determine that the court of this State is a more appropriate forum, the court of this State shall dismiss the proceeding.

(Emphasis added).

F.L. § 9.5–207 is also relevant, it states:

**§ 9.5–207. Finding that court is inconvenient forum.**

(a) *Action if this State is inconvenient forum.*—(1) A court of this State that has jurisdiction under this title to make a child custody determination may decline to exercise its jurisdiction at any time if it determines that it is an inconvenient forum under the circumstances and that a court of another state is a more appropriate forum.

(2) The issue of inconvenient forum may be raised upon motion of a party, the court's own motion, or request of another court.

(b) *Factors in determination.*—(1) Before determining whether it is an inconvenient forum, a court of this State shall consider whether it is appropriate for a court of another state to exercise jurisdiction.

(2) For the purpose under paragraph (1) of this subsection, the court shall allow the parties to submit information and shall consider all relevant factors, including:

(i) whether domestic violence has occurred and is likely to continue in the future and which state could best protect the parties and the child;

(ii) the length of time the child has resided outside this State;

(iii) the distance between the court in this State and the court in the state that would assume jurisdiction;

(iv) the relative financial circumstances of the parties;

(v) any agreement of the parties as to which state should assume jurisdiction;

(vi) the nature and location of the evidence required to resolve the pending litigation, including testimony of the child;

(vii) the ability of the court of each state to decide the issue expeditiously and the procedures necessary to present the evidence; and

(viii) the familiarity of the court of each state with the facts and issues in the pending litigation.

(c) *Stay proceeding.*—If a court of this State determines that it is an inconvenient forum and that a court of another state is a more appropriate forum, it shall stay the proceedings upon condition that a child custody proceeding be promptly commenced in another designated state and may impose any other condition the considers just and proper.

(d) *Effect of divorce or other proceeding.*—A court of this State may decline to exercise its jurisdiction under this title if a child custody determination is incidental to an action for divorce or other proceeding while still retaining jurisdiction over the divorce or the other proceeding.

Under the UCCJEA, F.L. § 9.5-208 provides:

## § 9.5-208. Declining jurisdiction.

(a) *In general.*—Except as otherwise provided in § 9.5-204 of this subtitle or by other law of this State, if a court of this State has jurisdiction under this title because a person seeking to invoke its jurisdiction has engaged in unjustifiable conduct, *the court shall decline to exercise its jurisdiction unless:*

(1) *the parents and all persons acting as parents have acquiesced in the exercise of jurisdiction*

(2) *a court of the state otherwise having jurisdiction under §§ 9.5-201 through 9.5-203 of this subtitle determines that this State is a more appropriate forum under § 9.5-207 of this subtitle; or*

(3) *no court of any other state would have jurisdiction under the criteria specified in §§ 9.5–201 through 9.5–203 of this subtitle.*

(b) *Remedy.*—If a court of this State declines to exercise its jurisdiction under subsection (a) of this section, it may fashion an appropriate remedy to ensure the safety of the child and prevent a repetition of the unjustifiable conduct, including staying the proceeding until a child custody proceeding is commenced in a court having jurisdiction under §§ 9.5–201 through 9.5–203 of this subtitle.

(c) *Assessment of expenses and fees.*—(1) If a court dismisses a petition or stays a proceeding because it declines to exercise its jurisdiction under subsection (a) of this section, the court shall assess against the party seeking to invoke the court's jurisdiction necessary and reasonable expenses, including costs, communication expenses, attorney's fees, investigative fees, expenses for witnesses, travel expenses, and child care during the course of the proceedings, unless the party from whom fees are sought establishes that the assessment would be clearly inappropriate.

(Emphasis added).

F.L. § 9.5–312 provides:

### § 9.5–312. Expenses.

(a) *In general.*—The court shall award the prevailing party, including a state, necessary and reasonable expenses incurred by or on behalf of the party, including costs, communication expenses, attorney's fees, investigative fees, expenses for witnesses, travel expenses, and child care expenses during the course of the proceedings, unless the party from whom fees or expenses are sought establishes that the award would be clearly inappropriate.

(b) *State exemption.*—The court may not assess fees, costs, or expenses against a state unless authorized by law other than this title.

Appellant relies on the definition of "state" in F.L. § 1–101(e) to support her claim that the UCCJA did not apply to foreign jurisdictions such as India. F.L. § 1–101(e) defines

"State" to mean "(1) a state, possession, or territory of the United States; (2) the District of Columbia; or (3) the Commonwealth of Puerto Rico."

In appellant's view, "The purpose of the UCCJA is to resolve issues between sister states and not between a state and a foreign nation." She adds that "the use of the word state can only mean a state of the United States," because any other construction would render redundant F.L. § 9–203, pertaining to "International Scope." Moreover, appellant points out that while a proceeding was pending in India, the foreign court had not issued an order, judgment, or decree. Accordingly, there was no decree that was subject to enforcement under F.L. § 9–203.

Further, appellant argues:

> Since the definition of State within the purview of the Uniform Child Custody Jurisdiction Act is controlled by the definition of state within Family Law Article 1–101 as being a state of the United States of America, the international application of UCCJA does not permit the dismissal of the Wife's Complaint in this proceeding.
>
> Maryland courts have jurisdiction over minor children residing in the State so as to issue appropriate orders concerning custody and visitation, albeit temporary or through a limited divorce, and Mother's Complaint should proceed to trial.

Therefore, appellant maintains that the court erred when it dismissed the suit because of the pendency of a child custody case "in another nation."

■ Appellee disputes appellant's interpretation of the statutory scheme.[21] Although appellee concedes that "Maryland

---

21. Preliminarily, appellee asserts that "[e]very argumentative point in [a]ppellant's brief is unpreserved." In particular, he contends that appellant conceded that the UCCJA applies to India. He asserts that appellant failed to preserve three main arguments raised in her appeal: (1) the UCCJA does not apply to India because India is not a "state" as defined by the Family Law Article; (2) the circuit court erred in dismissing appellant's action for lack of jurisdiction because the court

appellate courts have not directly addressed the issue of whether a foreign nation is a 'state' in the context of the UCCJA," he maintains that the circuit court properly applied F.L. § 9-208(a). He asserts:

This Court should therefore reject Appellant's argument that the Court reverse course and change its definition of "state." To do so would run contrary to the purposes of the UCCJA, as recognized by this Court, and encourage the type of child snatching and forum shopping in which Appellant engaged.

Every state enacted the UCCJA in some form. 9 U.L.A. 115 (1988); *see also* Lara Cardin, Comment, *The Hague Convention on the Civil Aspects of International Child Abduction as Applied to Non-signatory Nations: Getting to Square One,* 20 Hous. J. Int'l L. 141, 170 (1997) ("Cardin"). To our knowledge, however, no Maryland appellate case has addressed the issue of whether a foreign nation is considered a state under the UCCJA for purpose of a case such as this one.

To be sure, numerous other states have concluded that the UCCJA applies to international custody disputes. *See, e.g., In re Stephanie M.,* 7 Cal.4th 295, 27 Cal.Rptr.2d 595, 867 P.2d 706, 713 (1994) (finding California version of UCCJA applies "to international custody disputes" in holding that juvenile court was not required to enforce Mexican decree granting custody to child's grandmother); *Bliss v. Bliss,* 733 A.2d 954, 958-59 (D.C.1999) (explaining that, pursuant to District of Columbia version of the UCCJA, Russian custody decree may

---

could exercise jurisdiction through F.L. § 1-201(a)(5), (6), (9) and subsection (b)(1)(2)(3), which provide jurisdiction to determine custody, visitation, and support; and (3) the circuit court erred when it awarded expenses and attorney's fees to appellee.

In light of our disposition, we need not reach appellee's claims of waiver. In any event, we observe that "[a] court is not bound by an erroneous concession of law." *State v. Greenstreet,* No. 2105, September Term, 2004, slip op. at 9-10, 162 Md.App. 768 (filed May 13, 2005) (and cases cited herein). Therefore, even assuming that appellant conceded that the UCCJA applied to India, such a concession would not be binding if it was an incorrect legal proposition.

only be recognized and enforced where the decree was issued in connection with proceedings that comported with ideals of due process of law); *Stock v. Stock,* 677 So.2d 1341, 1345, 1348 (Fla.Dist.Ct.App.1996) (stating that the "goals of the UCCJA apply even when the other jurisdiction is a foreign nation" and remanding custody case for further proceedings to determine "whether Switzerland properly exercised jurisdiction in conformity with the policies of the UCCJA"); *Ruppen v. Ruppen,* 614 N.E.2d 577, 581–82 (Ind.Ct.App.1993) (determining that Italy was a "state" within the meaning of Indiana version of UCCJA and declining jurisdiction because Italy was children's "home state"); *McFaull v. McFaull,* 560 So.2d 1013, 1014 (La.Ct.App.1990) (holding that "the general policies of the UCCJA (adopted by Louisiana) extend to the international area and recognition and enforcement of custody decrees are extended to other countries if there has been reasonable notice and the opportunity to be heard"); *Klont v. Klont,* 130 Mich.App. 138, 342 N.W.2d 549, 550 (1983) (ruling that Michigan version of UCCJA provided jurisdiction to hear custody dispute involving German temporary custody order because the Act applied "even if the foreign jurisdiction has not adopted the act, so long as the foreign court's exercise of jurisdiction conforms with the criteria enumerated in the act"); *Abu–Dalbouh v. Abu–Dalbouh,* 547 N.W.2d 700, 704 (Minn.Ct. App.1996) (rejecting argument that Minnesota's version of UCCJA did not apply to international custody disputes on grounds that Act specifically stated that it " 'extend[ed] to international proceedings' "); *Ivaldi v. Ivaldi,* 147 N.J. 190, 685 A.2d 1319, 1323–26 (1996) (holding that the term "state" in New Jersey version of UCCJA includes foreign countries, thereby rendering jurisdictional portions of Act applicable to international custody disputes); *Tataragasi v. Tataragasi,* 124 N.C.App. 255, 477 S.E.2d 239, 243–46 (1996) (determining that trial court had emergency jurisdiction despite father's pending action in Turkey where Turkish law was not in conformity with UCCJA or state law); *Black v. Black,* 441 Pa.Super. 358, 657 A.2d 964, 970 (1995) (ruling that foreign country may be considered "home state" for purposes of applying UCCJA);

*Adkins v. Antapara,* 850 S.W.2d 148, 151 (Tenn.Ct.App.1992) (applying UCCJA home state analysis to determine that Panama, rather than Tennessee, had jurisdiction over custody dispute); *Middleton v. Middleton,* 227 Va. 82, 314 S.E.2d 362, 368 (1984) (applying UCCJA home state analysis to international child custody dispute because the general policies of the Virginia version of UCCJA " 'extend[ed] to the international area' "); *Noordin v. Abdulla,* 88 Wash.App. 746, 947 P.2d 745, 753 (1997) (stating that "[t]he UCCJA applies to international custody cases").

On the other hand, other courts have ruled otherwise. *See, e.g., Koons v. Koons,* 161 Misc.2d 842, 615 N.Y.S.2d 563, 567 (N.Y.Sup.1994) ("Notwithstanding the language of [the New York version of the UCCJA], which extends the general policies of the UCCJA to the international arena, the specific sections of the UCCJA ... do not apply in an international custody adjudication, because a foreign country is not a 'state' within the meaning of the statute."); *In re Horiba,* 151 Or.App. 489, 950 P.2d 340, 345 (1997) (concluding that "generalized policy concerns" cannot alter the explicit definition of "state" in Oregon's version of the UCCJA).

Moreover, in their respective UCCJA statutes, Missouri, New Mexico, Ohio, and South Dakota did not include section 23 of the UCCJA, titled "International Application," which corresponds to F.L. § 9–203. Cardin, *supra,* 20 Hous. J. Int'l L. at 170 n. 244. Consequently, it seems likely that these states would conclude that the term "state" does not include a foreign country. *See State ex rel. Rashid v. Drumm,* 824 S.W.2d 497, 503 (Mo.Ct.App.1992) ("Since Missouri has not adopted [the international application provision] of the UCCJA, it is clear that the legislature did not intend the word 'state' as used in the [jurisdictional provision] to include a foreign country."); *Schroeder v. Vigil–Escalera Perez,* 76 Ohio Misc.2d 25, 664 N.E.2d 627, 637 (Ct.Com.Pl.1995) ("While some states have extended the general policies of the UCCJA to the international arena, Ohio has not promulgated similar provisions in its adoption of the UCCJA.").

In 1995, the National Conference of Commissioners on Uniform State Laws appointed a drafting committee to revise the UCCJA. Robert G. Spector, *International Child Custody Jurisdiction and the Uniform Child Custody Jurisdiction and Enforcement Act,* 33 N.Y.U.J. Int'l L. & Pol 251 (2000) ("Spector"). The revision, promulgated in 1997, resulted in the UCCJEA. *Id.* at 257. As we noted, in Maryland the UCCJA was recently replaced by the UCCJEA.

With respect to proceedings in foreign courts under the UCCJA, Spector has stated, *id.* at 258–59:

> Section 23 of the UCCJA provided that the general policies of the Act applied to foreign custody determinations.[ ] *Foreign custody determinations were to be recognized and enforced if they were made consistently with the UCCJA and there was reasonable notice and opportunity to be heard.* There were two types of issues that arose under this section. The first was whether a United States court would defer to a foreign tribunal when that tribunal would have jurisdiction under the UCCJA and the case was filed first in that tribunal. The second issue was whether a state of the United States would recognize, under this section, a custody determination made by a foreign tribunal.

(Emphasis added).

According to Spector, who was on the drafting committee, "the UCCJA was ambiguous" as to the matter of deferring to a foreign jurisdiction, and "only required application of the 'general policies' of the Act." He added, *id.* at 259:

> Frequently, courts in the United States would apply the same jurisdictional principles to international cases that they would apply in interstate cases.... *Most U.S. states enforced foreign custody orders* if made consistently with the jurisdictional standards of the UCCJA and reasonable notice and opportunity to be heard were afforded all participants.....

(Emphasis added).

Spector explains that the UCCJEA has resolved the ambiguity about which we are concerned. He states, *id.* at 260:

Section 105 of the UCCJEA provides that a court of the United States *shall treat a foreign country as if it were a state of the United States* for the purposes of applying the jurisdiction and cooperation sections of the Act.[ ] It further provides that *a court of the United States shall enforce a foreign custody determination* if it was made under factual circumstances in substantial conformity with the jurisdictional provisions of Article 2 of the UCCJEA.[ ] However, a court need not apply this section if the foreign custody law would violate fundamental principles of human rights.[ ] (Emphasis added).

 The well honed principles of statutory construction support Spector's view. The interpretation of a statute, such as the UCCJA or UCCJEA, is a judicial function. *See Johnson v. Mayor & City Council of Balt. City*, 387 Md. 1, 5–6, 874 A.2d 439 (2005); *Salamon v. Progressive Classic Ins. Co.*, 379 Md. 301, 307, 841 A.2d 858 (2004). Our primary goal in construing a statute is to ascertain and effectuate the intent of the Legislature. *Consol. Constr. Services, Inc. v. Simpson*, 372 Md. 434, 456, 813 A.2d 260 (2002); *Mayor & City Council of Balt. v. Chase*, 360 Md. 121, 128, 756 A.2d 987 (2000); *Chow v. State*, 163 Md.App. 492, 501, 881 A.2d 1148 (2005); *Hackley v. State*, 161 Md.App. 1, 11, 866 A.2d 906 (2005).

 In this endeavor, we are guided primarily by the statutory text. *Huffman v. State*, 356 Md. 622, 628, 741 A.2d 1088 (1999); *State v. Pagano*, 341 Md. 129, 133, 669 A.2d 1339 (1996). We give the words of the statute their ordinary meaning. *Ridge Heating, Air Conditioning & Plumbing, Inc. v. Brennen*, 366 Md. 336, 350, 783 A.2d 691 (2001); *Lewis v. State*, 348 Md. 648, 653, 705 A.2d 1128 (1998). If the statute is free of ambiguity, we generally will not look beyond the statute to determine legislative intent. *Kaczorowski v. Mayor & City Council of Balt.*, 309 Md. 505, 515, 525 A.2d 628 (1987); *Chow*, at 501, 881 A.2d 1148. We also "avoid construing a statute in a way which would lead to absurd results." *Blandon v. State*, 304 Md. 316, 319, 498 A.2d 1195 (1985). On the other hand,

where a statute is plainly susceptible of more than one meaning and thus contains an ambiguity, courts consider not only the literal or usual meaning of the words, but their meaning and effect in light of the setting, the objectives and purpose of the enactment. In such circumstances, the court, in seeking to ascertain legislative intent, may consider the consequences resulting from one meaning rather than another, and adopt that construction which avoids an illogical or unreasonable result, or one which is inconsistent with common sense.

*Tucker v. Fireman's Fund Ins. Co.*, 308 Md. 69, 75, 517 A.2d 730 (1986) (internal citations omitted); *see Md. Div. of Labor & Indus. v. Triangle Gen. Contractors, Inc.*, 366 Md. 407, 425, 784 A.2d 534 (2001); *Chesapeake Charter, Inc. v. Anne Arundel County Bd. of Educ.*, 358 Md. 129, 135, 747 A.2d 625 (2000).

Moreover, "[i]f reasonably possible," we read a statute so "that no word, phrase, clause, or sentence is rendered surplusage or meaningless," *Mazor v. State of Md., Dep't of Corr.*, 279 Md. 355, 360, 369 A.2d 82 (1977), or "superfluous or redundant." *Blondell v. Balt. City Police Dep't*, 341 Md. 680, 691, 672 A.2d 639 (1996); *see Eng'g Mgmt. Services v. Md. State Highway Admin.*, 375 Md. 211, 224, 825 A.2d 966 (2003); *Motor Vehicle Admin. v. Lytle*, 374 Md. 37, 61–62, 821 A.2d 62 (2003); *Mayor & Council of Rockville v. Rylyns Enterprises*, 372 Md. 514, 551, 814 A.2d 469 (2002). But, we may not read a meaning into the statute that is not expressly stated or clearly implied, or embellish a statute to expand its meaning. *Dep't of Econ. & Employment Dev. v. Taylor*, 108 Md.App. 250, 277–78, 671 A.2d 523 (1996), *aff'd*, 344 Md. 687, 690 A.2d 508 (1997). Put another way, courts may " 'not invade the function of the legislature' by reading missing language into a statute" to correct " 'an omission in the language of the statute even though it appeared to be the obvious result of inadvertence.' " *Graves v. State*, 364 Md. 329, 351, 772 A.2d 1225 (2001) (citation omitted). *See also Johnson*, 387 Md. at 14, 874 A.2d 439 ("We may not read

language into a statute that is not there, even if we are not satisfied with the outcome of the case.").

It is also noteworthy that we may look to the UCCJEA to elucidate the legislative intent as to the UCCJA. In this regard, we are guided by *State v. Bell*, 351 Md. 709, 718, 720 A.2d 311 (1998), in which the Court explained:

[W]hen we pursue the context of statutory language, we are not limited to the words of the statute as they are printed.... We may and often must consider other "external manifestations" or "persuasive evidence," *including ... its relationship to earlier and subsequent legislation, and other material that fairly bears on the fundamental issue of legislative purpose or goal,* which becomes the context within which we read the particular language before us in a given case.

(Quoting *Kaczorowski*, 309 Md. at 514–15, 525 A.2d 628) (emphasis added). *See also Williams v. State*, 292 Md. 201, 210, 438 A.2d 1301 (1981) (stating that presumption that the Legislature agrees with the Court of Appeals's interpretation of statute "is particularly strong whenever, after statutory language has been interpreted by this Court, the Legislature re-enacts the statute without changing in substance the language at issue"); *Hoffman v. Key Fed. Sav. & Loan Assoc.*, 286 Md. 28, 37, 416 A.2d 1265 (1979) (explaining that "recodification of statutes is presumed to be for the purpose of clarity rather than change of meaning and, thus, even a change in the phraseology of a statute by codification will not ordinarily modify the law unless the change is so radical and material that the intention of the Legislature to modify the law appears unmistakably from the language of the Code").

■ With these principles in mind, we believe the plain meaning of the UCCJEA makes clear that the term "state" applies to foreign nations, so long as the foreign custody law does not offend our public policy. Therefore, we conclude that the trial court properly determined that India is deemed a state for purposes of this custody case, so long as its child

custody law does not violate "fundamental principles of human rights." F.L. § 9.5–104(c).

For the benefit of the parties and the court on remand, we shall also briefly address the matter of a child's "home state." Under the prior statute, "There are four bases for jurisdiction ....: (1) home state, (2) significant connections, (3) abandoned children or emergency situation and (4) other state jurisdiction." *Malik v. Malik,* 99 Md.App. 521, 525–26, 638 A.2d 1184 (1994), *appeal after remand, Hosain v. Malik,* 108 Md.App. 284, 671 A.2d 988 (1996); F.L. § 9–204. We discern no change under the UCCJEA.

The UCCJA (F.L. § 9–204(a)(1)(i)) and the UCCJEA (F.L. § 9.5–101(h)) define "home state," *inter alia,* as the state in which the child lived "for at least 6 consecutive months...." When appellant filed for custody, the child had been living in Maryland for six months. Therefore, the court below was clearly erroneous to the extent that it found that Maryland was not a home state of the child.

In this regard, *Malik,* 99 Md.App. 521, 638 A.2d 1184, is instructive. In that case, we considered whether the circuit court properly denied comity to a Pakistani custody order. The mother (appellee) took the parties' child with her when she left the marital home in Pakistan. The father (appellant) then filed suit in Pakistan to obtain custody. After appellee learned of the suit, she fled with the child to this country. Shortly thereafter, she moved into the home of another man and continued to live with him. She gave birth to his son in 1991. *Id.* at 524, 638 A.2d 1184. Although the mother was represented by counsel in the Pakistani custody proceeding, she refused to appear or to produce the child, as ordered. The Pakistani court awarded custody to appellant.

After appellant obtained legal custody of the couples' daughter, he "set out to find her." *Id.* After the father located the child and appellee in Baltimore County, the mother filed a complaint in the Circuit Court for Baltimore County, requesting custody of the child. At the conclusion of an emergency hearing, the trial judge determined that the circuit court had

jurisdiction to determine custody; that the Pakistani custody order was not entitled to comity; and that temporary custody should be granted to the mother. *Id.*

Of import here, we were "persuaded that the Circuit Court for Baltimore County does have home state jurisdiction over this dispute," within the meaning of F.L. § 9–201(f). *Id.* at 525, 638 A.2d 1184. We said, *id.* at 528–29, 638 A.2d 1184:

"Home state" as defined in FL § 9–201(f) "means the state in which the child, immediately preceding the time involved, lived with the child's parents (or) a parent . . . for at least six consecutive months." As the child has lived in Maryland for the past two years, Maryland qualifies as her "home state" under the U.C.C.J.A.

In *Mainster v. Mainster,* 466 So.2d 1228 (Fla.App. 2 Dist.1985), a child who had been living with her mother in Florida was removed to Virginia by her father and remained in Virginia for almost a year before her mother took her back to Florida. On the day the child was taken from Virginia, her father filed an emergency petition for temporary custody in a Virginia state court. He was awarded custody and attempted to enforce the award in Florida. A Florida trial court dismissed his petition because the child had been kidnapped to Virginia. The appellate court reversed, explaining that the Virginia court did have home state jurisdiction to grant custody because "regardless of the circumstances under which [the child] had been taken to live in Virginia, she had lived there for the requisite six months preceding the father's filing his action." 466 So.2d at 1229.

*We hold that Maryland has home state jurisdiction under the statute because the child has lived here for longer than the requisite six months.*

(Emphasis added).

Also of note, we determined that the child could simultaneously maintain "home state" jurisdiction in both Pakistan and Maryland. We reasoned:

The "home state" provision of the U.C.C.J.A. was introduced to provide protection for a parent who remains in the home state after the other parent has taken the child away. In enacting that provision, the drafters of the act were attempting to mitigate the advantage enjoyed by the party who has physical possession of the child. JEFF ATKINSON, MODERN CHILD CUSTODY PRACTICE § 3.12, 192 (1986). The Commissioners' Note to the U.C.C.J.A § 3 states:

> The main objective [of the six month home state window] is to protect a parent who has been left by his spouse taking the child along. The provision makes clear that the stay at home parent . . . may start proceedings in his own state.

Nothing in the U.C.C.J.A. provides that there can only be one "home state." In this case, there are two. Appellant sued for custody in Pakistan shortly after appellee vacated the marital home. While the Pakistani court had jurisdiction to do so, it conducted a full trial on the merits before awarding custody to appellant. Pakistan was the child's original "home state." *Maryland has become the child's "home state" only because appellee, in disobedience of the Pakistani court, hid the child from appellant for over two years.*

*Id.* at 529–30, 638 A.2d 1184 (emphasis added). Nevertheless, we cautioned: "Rare are the occasions on which a second home state should exercise jurisdiction acquired by disobedience of a custody order issued in the child's original home state." *Id.* at 530, 638 A.2d 1184.

Our consideration of the parties' ties to Maryland and Pakistan was central to our decision. We observed:

> The parties to this case were married in Pakistan. They are both citizens of that country. The minor child was born and raised there until she was wrongfully removed. When appellant originally filed for custody, Pakistan was the only home the child had ever known. Under these circumstances, the assumption of jurisdiction by a Maryland Court would appear to offend the controlling principles behind the

U.C.C.J.A. Absent the most extraordinary circumstances, *a party should not be permitted to obtain relief from a Maryland court by acting with unclean hands in violation of another court's order.*

*Id.* at 525, 638 A.2d 1184 (emphasis added).

In holding that the circuit court was required to decline jurisdiction over the child custody matter *unless* it was persuaded that the Pakistani court failed to apply the best interest of the child standard in awarding custody to the father, this Court explained, *id.* at 534–35, 638 A.2d 1184:

> If the Pakistani court's custody order was founded on principles of law that are repugnant to Maryland public policy, the Circuit Court for Baltimore County must exercise its jurisdiction. If the Pakistani court's determination was made without giving primary consideration to the best interest of the child, the circuit court must resolve this dispute by applying that standard. If the Pakistani court's determination was made on the basis of a rule of law or evidence or procedure so contrary to Maryland public policy as to undermine confidence in the outcome of the trial, the circuit court must exercise its jurisdiction and resolve this dispute by applying Maryland law.

We concluded that we could not uphold "the circuit court's refusal to grant comity to the Pakistani custody order," and remanded "for further proceedings," *id.* at 525, 638 A.2d 1184, with the following direction, *id.* at 536, 638 A.2d 1184:

> On remand, the circuit court must first determine whether the Pakistani court applied law that is in substantial conformity with Maryland law. That determination requires the presentation of evidence.... The Pakistani court's custody order is presumed to be correct, and this presumption shifts to appellee the burden of proving by a preponderance of evidence that (1) the Pakistani court did not apply the "best interest of the child" standard, or that (2) in making its decision, the Pakistani court applied a rule of law or evidence or procedure so contrary to Maryland public policy as to undermine confidence in the outcome of

the trial. If either (1) or (2) is proven, the circuit court must conclude that the law of Pakistan is so lacking in conformity with the law of Maryland that comity cannot be granted to the Pakistani custody order. Unless either is proven, however, the Circuit Court shall decline to exercise its jurisdiction and shall grant comity to the Pakistani custody decree.

*See also Telnikoff v. Matusevitch,* 347 Md. 561, 574, 702 A.2d 230 (1997) (citing *Malik* and stating that "[a]lthough foreign judgments are entitled to a degree of deference and respect under the doctrine of comity, courts will nonetheless deny recognition and enforcement to those foreign judgments which are inconsistent with the public policies of the forum state").

As we noted, *Malik* makes clear that, even if a child is improperly removed to Maryland, in violation of a court order, Maryland may still become a "home state." In other important respects, however, *Malik* is readily distinguishable from the case *sub judice.* In *Malik,* the parents and the child were all citizens of Pakistan. Here, the mother is a United States citizen, and she claims that the child is as well.[22] Further, in *Malik* the Pakistani court had issued an order on the merits, awarding custody to the father. At the time this matter was heard, however, the Indian court had not issued an order granting custody to appellee, nor had appellant violated a court order when she left India with the child. Indeed, it is not entirely clear that the Indian court had personal jurisdiction over appellant until well after she filed the custody case here. Furthermore, unlike in this case, the child in *Malik* never had contact with this country prior to the mother's relocation to this country.

We have found no support in the UCCJA for the court's determination that home state jurisdiction is lost when a child has been impermissibly removed from one jurisdiction to another. As this Court explained in *Malik,* despite a parent's improper removal of a child from a foreign country to Mary-

---

**22.** The court did not resolve the issue of the child's citizenship.

land, this State may nonetheless serve as the child's "home state" under the UCCJA.[23]

We observe that F.L. § 9.5–204(d) and § 9.5–206(b)(2) obligate the court to communicate with the court of a state in which a custody proceeding is already pending. In this respect, on remand, the court must comply with the UCCJEA.

### IV.

At the fee hearing on February 23, 2004, Judge Cox entertained argument regarding appellant's contention that fees should not be awarded because of the inapplicability of the UCCJA. Ultimately, Judge Cox determined that Judge Fader's ruling on September 23, 2003, was made under F.L. § 9–208, and she found that the provision conferred discretion on the court to assess fees and costs. Therefore, Judge Cox determined that she would "enter a judgment in the amount that is set forth in the petition," because the fees were "reasonable."

Appellant complains, *inter alia*, that the court erred in awarding legal fees and other costs to appellee, because foreign nations are not states under the UCCJA. Therefore, says appellant, the UCCJA provisions awarding fees are not applicable. For the reasons advanced previously, we reject this contention.

The sole purpose of the hearing on February 23, 2004, was to determine the *amount* of the award for expenses and fees, pursuant to the court's ruling on September 23, 2003. Even assuming, as appellee claims, that appellant waived her right to challenge the entitlement to fees and costs under the

---

**23.** For a discussion of home state jurisdiction under the UCCJA, *see Gestl v. Frederick*, 133 Md.App. 216, 754 A.2d 1087 (2000); *Etter v. Etter*, 43 Md.App. 395, 405 A.2d 760 (1979); *Paltrow v. Paltrow*, 37 Md.App. 191, 376 A.2d 1134 (1977), *aff'd*, 283 Md. 291, 388 A.2d 547 (1978).

UCCJA, she certainly did not forego her right to attack the legitimacy or reasonableness of the fee petition.

In view of our decision to remand, however, we shall vacate the award of fees and costs, pending the outcome of the custody case. If the court determines that an award of attorney's fees and costs is appropriate under the UCCJEA, it should determine whether a lodestar analysis applies in light of *Friolo v. Frankel,* 373 Md. 501, 819 A.2d 354 (2003), and *Manor Country Club v. Flaa,* 387 Md. 297, 300, 874 A.2d 1020 (2005) (concluding that, "when attorney's fees are permitted by statute or ordinance, the lodestar approach to the calculation of reasonable attorney's fees is generally the correct approach, *except* in instances where other criteria for the calculation of such fees are provided . . . in the fee-shifting statute").[21]

**JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE COUNTY VACATED. CASE REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS TO BE PAID 50 PERCENT BY APPELLANT, 50 PERCENT BY APPELLEE.**

---

24. The *Friolo* Court defined "lodestar" as follows, 373 Md. at 504 n. 1, 819 A.2d 354:

The term "lodestar" has an Anglo-Saxon origin—"lad," a way or path, and "sterre," a star. It thus was a guiding star. *See* WEBSTER'S UNABRIDGED DICTIONARY at 1062. It later came to denote a "guiding ideal; a model for imitation." *Id.* At some point, the term began to be applied to the method noted for determining reasonable attorneys' fees.