REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 2766

September Term, 2015

_____

NICOLE PILKINGTON

v.

ROMAN PILKINGTON, II

_____

Meredith,
Leahy,
Beachley,

JJ.

_____

Opinion by Leahy, J.
_____

Filed:  November 29, 2016

Nicole Pilkington (Appellant) challenges the Circuit Court for Harford County's jurisdiction to issue the underlying order awarding sole legal and primary physical custody of her child R.P., to her former husband, Roman Pilkington, II (Appellee). Ms. Pilkington is a citizen and current resident of Germany. Mr. Pilkington is a Sergeant in the United States Army, and the transience of his residences in that service underlies the issues at the crux of this case.

The parties met in 2003 in Germany where they got married and became the parents of R.P. During the time the married couple lived in Germany, Ms. Pilkington also gave birth to B.P., who, it was later determined, was not the biological child of Mr. Pilkington. The parties moved to Colorado, where they divorced two years later and entered into a court-ordered custody plan for R.P., awarding Ms. Pilkington primary physical custody.[1] After another three years, Mr. Pilkington moved to Maryland, where he currently resides.

In 2014, Ms. Pilkington took B.P. and R.P. to Germany for a month-long vacation, and then decided unilaterally to stay in Germany and enroll both children in school there, in violation of the Colorado court's custody order for R.P. Nineteen months later, when Ms. Pilkington allowed R.P. and his sister to visit his father in Maryland, Mr. Pilkington

---

[1] The parenting plan from the Colorado divorce and custody proceedings that is part of the limited record in this case does not include a plan for B.P. In the Third Party Complaint for Custody filed below by Mr. Pilkington for the custody of B.P., Mr. Pilkington averred that "no court or judicial body of the United States or any foreign country has issued an order regarding a custodial arrangement for the minor child, B.P."

sought judicial intervention. He filed two emergency custody petitions in the Circuit Court for Harford County for R.P. and B.P.

At the emergency custody hearing, Ms. Pilkington appeared through counsel and challenged the court's jurisdiction under the Maryland Uniform Child Custody Jurisdiction and Enforcement Act ("Maryland UCCJEA" or "Act"), Maryland Code (1984, 2012 Repl. Vol.), Family Law ("FL") § 9.5-101 *et seq.* The court decided it could exercise jurisdiction under the Act, but ordered Mr. Pilkington to return the children to Germany until the court could conduct a full trial. Once the children were back in Germany, Ms. Pilkington broke off all communications and did not participate in any further court proceedings preceding this appeal. In response, the circuit court determined that Ms. Pilkington's behavior was inconsistent with R.P.'s best interest and awarded sole legal and primary custody of R.P. to Mr. Pilkington.

Ms. Pilkington presents the following issues:

1) "Whether the lower court erred when it modified custody without subject matter jurisdiction."

2) "Whether the lower court erred and violated the Mother's due process rights and fundamental liberty interest in the care, custody and control of her son in violation of the United States Constitution, the Maryland Declaration of Rights and Maryland statutory and case authority when it failed to provide the Mother notice and an opportunity to be heard."

3) "Whether the lower court erred and violated the Mother's due process rights and fundamental liberty interest in the care, custody and control of her son when it exceeded the authority afforded it by the Maryland Rules."

3

4) "Whether the lower court abused its discretion when it modified and changed custody without holding a hearing and without any factual findings."

We hold that the circuit court in this case exceeded the jurisdictional restraints imposed under the Maryland UCCJEA by entering an order that modified a foreign jurisdiction's existing custody order when Maryland was not the child's home state and there was no other jurisdictional basis to modify an existing order under FL § 9.5-203. We, therefore, must vacate the circuit court's order and remand the case with instructions that the court limit itself to the authority contained in the Maryland UCCJEA's enforcement subtitle.

## BACKGROUND

### A. The Marriage and Divorce

Mr. Pilkington met Ms. Pilkington, a German national, while he was stationed with the United States Army in Schweinfurt, Germany. On May 23, 2003, the couple married in Niederwerrn, Bavaria, Germany, where they lived until December 2008 when the Army transferred Mr. Pilkington to Colorado Springs, Colorado. During their marriage and while the couple still resided in Germany, Ms. Pilkington gave birth to two children: B.P., born in 2004, and R.P., born in 2006. The couple remained married until October 28, 2010, at which point they obtained a Decree of Dissolution of Marriage ("Colorado Order") in the District Court for El Paso County, Colorado. A paternity test at the time of the parents' divorce proved that Mr. Pilkington is not B.P.'s biological father, although her birth certificate identifies him as the father. R.P. is Mr. Pilkington's biological son.

4

The Colorado Order incorporated a parenting plan for R.P., which set child support, provided Ms. Pilkington with primary physical custody of R.P., and granted Mr. Pilkington weekend visitation during the school year and a total of 170 overnights per year.[2] The Colorado Order also required that either parent wishing to relocate the child must "file a Motion with the Court . . . and obtain court permission to relocate, unless the parties have submitted to the Court a written agreement/stipulation[.]"

## B. Custody, Visitation & the Underlying Dispute

After the Pilkingtons lived separately in Colorado for almost three years, the Army transferred Mr. Pilkington from Colorado Springs to Aberdeen Proving Ground, Maryland, in October of 2013. The children remained in Colorado with Ms. Pilkington from October until their school's Christmas break, at which point they traveled to Maryland to spend the holiday with Mr. Pilkington. Then, at Ms. Pilkington's request, Mr. Pilkington provided Ms. Pilkington with written permission allowing her to take the children to visit her family in Germany from January 25, 2014 to February 20, 2014.[3] Once in Germany, Ms. Pilkington decided unilaterally to remain there with the children and enroll them in a German primary school. She did not ask Mr. Pilkington for a joint stipulation to amend

---

[2] The Colorado Order incorrectly provided Ms. Pilkington with 265 yearly overnights and Mr. Pilkington with 170. Ms. Pilkington presumes that the error is with Mr. Pilkington's allotted number and the correct distribution is 265 nights with Ms. Pilkington and 100 with Mr. Pilkington.

[3] Ms. Pilkington notes that this permission was not required for B.P. since there was no court order in place regarding her custody.

the parental plan, nor did she seek the Colorado court's permission to relocate the children pursuant to the Colorado Order. That summer, Mr. Pilkington travelled to Germany to visit the children. He returned to Maryland two weeks later without having sought a court order to enforce his custody rights.

A year passed before Mr. Pilkington would see the children again. At no point in the meantime did Mr. Pilkington file a motion in any court for the children's return. The following summer, with Ms. Pilkington's permission, Mr. Pilkington flew to Germany to pick up the children to bring them to Maryland from June 29, 2015, until September 11, 2015, at which point they were to return to Germany. When the time came for the children to return to Germany, Mr. Pilkington took the children only as far as Philadelphia International Airport. Once at the airport, Mr. Pilkington claims the children were upset to leave him so he took them back to Maryland where he enrolled them in school.

## C. The Emergency Custody Hearing

Ten days after the children were supposed to fly back to Germany, Mr. Pilkington, through counsel, sent Ms. Pilkington notice electronically, advising her that he would be filing an "Ex Parte Petition for Emergency Custody in the Circuit Court for Harford County on September 24th, 2015 at 8:30 a.m." Two days later, Mr. Pilkington again sent Ms. Pilkington and her Maryland counsel notice of the action and certification of service—this time by both email and regular mail. Then, on September 24, 2015, Mr. Pilkington filed his petition for temporary custody of R.P. and a corresponding affidavit in compliance with

6

the requirements for a petition to enforce child custody determination.[4]  Mr. Pilkington brought his petitions pursuant to FL §§ 9.5-204 and 9.5-304, as well as § 9.5-303, and filed his affidavit of compliance pursuant to § 9.5-308 of the same title.

Mr. Pilkington's complaint alleged that Ms. Pilkington kept the children in Germany in disregard of the Colorado Order, depriving Mr. Pilkington of his rights therein.  Mr. Pilkington asked the court "to issue a temporary order enforcing the visitation schedule made by the Colorado court until such time that the foreign judgment can be registered in Maryland, and order that [he] be awarded primary physical custody of [R.P.] on a *pendente lite* basis."  Mr. Pilkington only sought custody *pendente lite* because, he reasoned, that if granted, "Maryland [would] become the 'home state' of [the children] in December 2015.[5]

That same day, the circuit court held an emergency custody hearing.  As an initial matter at the hearing, Ms. Pilkington appeared through counsel and questioned the court's subject matter jurisdiction to hear the case under the Maryland UCCJEA.  The court observed: "If [the children] had gone from Colorado to Maryland, I would agree one hundred percent that you are in the wrong court.  Since they had that year span or year plus over in Germany, then under the [Maryland UCCJEA] there really isn't any state in this country that has clear, pure six month jurisdiction."  Mr. Pilkington's counsel

---

[4] Mr. Pilkington also filed a third party complaint for permanent custody of B.P. The separate motions were required because the children presented different jurisdictional and custodial issues.

[5] FL § 9.5-101(h) provides that a state qualifies as a child's home state for jurisdictional purposes once a child has lived there for six consecutive months.

acknowledged the home state issue, noting: "Due to the home state issue of six months, I was going to file that in December when that time comes." Ultimately the court found that it had jurisdiction:

> Under the [Maryland UCCJEA] -- once again, if we didn't have that little intercession in Germany for over a year, clearly we wouldn't [have jurisdiction] and I would tell you all to pack your bags and go see beautiful Colorado. . . . But we do have that. So, if you look at what state in the union has any [jurisdiction], there is really no longer one that is clear. We look at the contacts with this state and at this point in time you still have two states fighting for it, one is Colorado under a continuing jurisdiction aspect and it is their Order, et cetera, but nobody has been there for over a year. Nobody has been here for long. The end of June and three months is all we have. So, it isn't terrific contact, but it certainly seems to beat anybody else in the USA. So, I'm not concerned on a jurisdictional aspect.

After hearing proffers from each parties' counsel but no testimony, the court ordered Mr. Pilkington to surrender both children's passports and ordered that, pending trial, the children should return to their mother in Germany, with R.P. to return to Maryland for his entire Christmas vacation at Ms. Pilkington's expense. At Mr. Pilkington's request, the court agreed to include in its order a requirement that Ms. Pilkington return the children for trial, and if not, the court would "have the trial without her." The court's orders, however, do not explicitly include this mandate.

The Office of the Family Law Case Coordinator for the circuit court mailed the parties' respective counsel copies of the Order for Referral on October 14, 2015, ordering the Office of Family Court Services:

1) To evaluate each party's ability to meet the child(ren)'s needs;
2) To evaluate each party's ability to make decisions which prioritize the needs of the child(ren);

8

3) To evaluate each party's ability to co-parent;
4) To evaluate each party's attitude toward the child(ren)'s relationship with the other party;
5) To evaluate the child(ren)'s adjustment to the current living arrangement;
6) To evaluate the child(ren)'s past and present relationship with each party;
7) To help the parties implement and develop a visitation schedule and to reduce the dates and times to writing;
8) Should there be a decrease or increase in visitation;
9) Should there be a change in custody if a parent moves out of the state.
10) To update the prior evaluation.

The referral order also directed that:

[T]he Evaluator shall spend a maximum of four sessions in the evaluation of the parties and the child or children, and that the parties to this proceeding shall cooperate with the Evaluator in the scheduling of appointments, and if in the judgment of the Evaluator either party shall fail to cooperate in the scheduling of appointments, then the Evaluator shall notify the Court of this fact; and

[T]hat the Evaluator shall have the right to terminate th[e] referral if the Evaluator deems the referral inappropriate or the parties fail to cooperate. Such termination shall be made by sending written notice of that fact to the Court[.]

A hearing was scheduled for December 29, 2015, and the Evaluator along with the parties and their respective attorneys were directed to appear.

## D. The Second Custody Hearing

On October 19, 2015, Mr. Pilkington mailed Ms. Pilkington two Writs of Summons, seeking a written response to his complaints filed in the Ex Parte Emergency Petition for Custody and Third Party Complaint for Custody. The court held a hearing with the evaluator on December 29, 2015. Ms. Pilkington did not attend the hearing and the evaluator testified that Ms. Pilkington "had no contact via e-mail, letter or phone with this

9

evaluator since October the 16th of 2015[,]" despite "[n]umerous attempts . . . with no response." She also failed to return R.P. to his father for Christmas vacation, contrary to the court's September 24, 2015 order.

After the evaluator entered her report at the December 29, 2015 hearing, Mr. Pilkington's counsel asked the court:

> [E]ither by way of enrolling the Colorado Court Order or this Court issuing its own Order that we get a Custody Order in place in Maryland. At that point I think [Mr. Pilkington] could take that to law enforcement and file charges against her and then proceed to go to Germany with the aid of law enforcement and show her the Court Order and hopefully bring back the kid.
> In the interim, because there is no Court Order in Maryland in place right now, I would ask at the very least that the Court issue a Show Cause Order so that can be served on her prior to or in advance of the Pretrial Conference, because we have a Pretrial Conference February the 14th so that I can serve her with that and then if she is not going to cooperate at that point issue a Body Attachment.

The court responded:

> All right. I'm inclined to simply make a recommendation that [Mr. Pilkington] be granted custody of the child. I mean, he is playing by the rules and [Ms. Pilkington's] not. I don't see any reason why we want to keep putting rules or making an Order for her that she is not going to obey.
>
> * * *
>
> . . . I'm a Magistrate, I'm not a Judge, but I'm going to make a recommendation. And it probably won't be signed [by the circuit court] until you get to that Pretrial [February 14, 2016] because I expect [Ms. Pilkington] will take Exceptions, but at least then a judge has got some idea what I think should be done and maybe if they agree with me they will continue it. If they don't, they will fashion some other remedy.
> But it is clear to mean -- I mean, to me in the list of factors as to what makes a good custodial parent, the biggest one is which parent will best facilitate a relationship with the other parent. It is clear to me that [Ms. Pilkington] is not willing to do that in any shape. [Mr.] Pilkington on the

other hand has played by the rules and he is willing to try to keep some kind of relationship going. He has been duped twice I would say and the Court has been duped once that if the kids get to Germany she will let him come back. She's not gonna [let R.P. come back] without some intervention.

So, that is what I'm going to recommend.

The next day, December 30, 2015, the presiding magistrate issued his report and recommendation, recommending that "[Mr. Pilkington] be granted Sole Legal and Primary Physical Custody of [R.P.]" The magistrate's report offered the following analysis:

> At this time it seems very clear that [Ms. Pilkington] has no intention of honoring any Maryland Court Order regarding Custody. It is her apparent intention to completely isolate [Mr. Pilkington] from [R.P.] This Magistrate considers [Ms. Pilkington's] action in this matter to be extremely detrimental to the father-son relationship between [Mr. Pilkington] and [R.P.] [Ms. Pilkington's] actions are definitely not in the Minor Child's best interest.
>
> In this case [Mr. Pilkington] has played by the rules and [Ms. Pilkington] has completely ignored them. The Magistrate believes that [Mr. Pilkington] will continue to facilitate a relationship between [R.P.] and [Ms. Pilkington] if [R.P.] is in his Custody. It is obvious that the reverse of this belief is not true.
>
> Based on the above the Magistrate finds that it is in [R.P.]'s best interest that [Mr. Pilkington] be granted his Sole Legal and Primary Physical Custody. Visitation between [R.P.] and [Ms. Pilkington] should be worked out after [Ms. Pilkington] agrees to participate in these Court proceedings.

The notice accompanying the report and recommendation explained the procedures for filing exceptions to the magistrate's recommendation and warned the parties that "[a]ny matter not specifically set forth in [an] exception[] is waived unless the Court finds that justice requires otherwise[,]" and that "[t]he Court may dismiss the exceptions of a party who has not complied with [Maryland Rule 9-208]." The court mailed both its report and recommendation and the corresponding notice to both parties. Mr. Pilkington's counsel also mailed Ms. Pilkington a copy by restricted delivery.

11

Ms. Pilkington did not respond or file any exceptions. On January 12, 2016, the Circuit Court for Harford County adopted the Magistrate's recommendation, issuing an order that stated simply: "**Ordered** that [Mr. Pilkington] be granted Sole Legal and Primary Physical Custody of [R.P.]" Ms. Pilkington noted her timely appeal.[6]

## I.

## DISCUSSION

### A. Appeal of Interlocutory Order

There is no final judgment in the present case,[7] yet we retain appellate jurisdiction for the following reason. On September 24, 2015, Mr. Pilkington filed two separate complaints for custody in the Circuit Court for Harford County—one for custody of R.P. and one for custody of B.P. These two cases apparently were consolidated because, as described *supra*, the September 24, 2015 custody hearing addressed the custody of both children, and, further, both cases bear the docket number of 12-C-15-2714. On January 13, 2016, the circuit court entered an order granting "Sole Legal and Primary Physical Custody" of R.P. to Mr. Pilkington; however, this order did not address the custody of B.P.

---

[6] Mr. Pilkington did not file a brief with this Court in response to Ms. Pilkington's appeal.

[7] Although there is no separate judgment or order by the court, and nothing reflected on the docket pertaining to B.P., the record indicates that perhaps the court intended to dismiss the complaint concerning B.P. when it stated, "[B.P.] as far as I'm concerned needs to go back to mom."

Apparently confused as to the legal effect of this order, Mr. Pilkington's counsel sent the court a letter on January 21, 2016, seeking clarification as to whether the court's "January 2016 Order is to be given effect on a pendente lite basis, or if it is a final judgment," and asking permission to "appear by phone at the pre-trial conference on February 11, 2016." The court granted the request and held a discussion telephonically off the record. The docket then notes "Custody order previously signed. Court to close file[,]" thereby confirming that the January 13, 2016 custody order was final as to R.P. The docket notes that the case was closed on February 12, 2016.

We indisputably have appellate jurisdiction over the order granting sole legal and primary physical custody of R.P. to Mr. Pilkington under Maryland Code (1973, 2013 Repl. Vol.), Courts and Judicial Proceedings Article ("CJP"), § 12-303(x) which grants a party a right to appeal from an interlocutory order "[d]epriving a parent, grandparent, or natural guardian of the care and custody of his child, or changing the terms of such an order[.]" *See Cabrera v. Mercado*, ___ Md. App. ___, ___, Nos. 1304 & 2393, September Term 2015, slip op. at 28. Ms. Pilkington's February 16, 2016 notice of appeal effected a valid interlocutory appeal.[8]

---

[8] The circuit court did not grant custody of B.P. to Mr. Pilkington, and Mr. Pilkington did not file a brief in this Court or a notice of appeal in the circuit court; therefore, issue of the court's jurisdiction over the custody of B.P. is not before us.

## B. The Maryland UCCJEA

### 1. The Goals and Principles Underlying Maryland's UCCJEA

In 2004, Maryland adopted the Maryland UCCJEA to govern child custody actions.[9] This Court has long-recognized that the legislature adopted the Maryland UCCJEA's predecessor, the Maryland Uniform Custody Jurisdiction Act ("UCCJA"), "to 'deter abductions and other unilateral removals of children undertaken to obtain custody awards.'" *Cronin v. Camilleri*, 101 Md. App. 699, 710 (1994) (quoting FL § 9-202(5)). In *Malik*, we observed:

> "The Prefatory Note to the U.C.C.J.A. notes a growing public concern over the fact that thousands of children are shifted from state to state and from one family to another each year while their parents or other persons battle over their custody in courts of various states. Snatching children has become all too commonplace in our mobile society. Possession of the child has historically given one an enormous tactical advantage."

*Malik v. Malik*, 99 Md. App. 521, 530 (1994) (quoting John F. Fader, II & Richard P. Gilbert, Maryland Family Law 167 (1990)); *see also In re Kaela C.*, 394 Md. 432, 453 (2006) (citations omitted) ("The [UCCJA] was promulgated . . . to address . . . the rampant kidnap[p]ing of children by parents looking to relitigate custody determinations in a more favorable forum, a tactic known as 'seize and run.'"). In fact, this Court has explained that "[t]he 'home state' provision," in particular:

---

[9] "The [Maryland] UCCJEA took effect on October 1, 2004, by virtue of § 2 of Ch. 502 of the Acts of 2004. It replaced an earlier statute, the Uniform Child Custody Jurisdiction Act ("UCCJA"), which had been the controlling law in Maryland from 1975 through 2004." *Appenyo v. Appenyo*, 202 Md. App. 401, 417-18 (2011).

was introduced to provide protection for a parent who remains in the home state after the other parent has taken the child away. In enacting [this] provision, the drafters of the act were attempting to mitigate the advantage enjoyed by the party who has physical possession of the child. Jeff Atkinson, Modern Child Custody Practice § 3.12, 192 (1986). The Commissioners' Note to the [UCCJA] § 3 states: "The main objective [of the six month home state window] is to protect a parent who has been left by his spouse taking the child along[.]"

*Malik*, 99 Md. App. at 529.

Courts around the country—including this Court—characterize a parent's taking of a child as "reprehensible conduct." *Malik*, 99 Md. App. at 532-33. With this in mind, the Court of Appeals has cautioned Maryland courts to avoid perversely incentivizing parents to use unlawful means to secure custody:

> "The resolution of cases must not provide incentives for those likely to take the law into their own hands. Thus, those who obtain custody of children unlawfully, . . . must be deterred. Society may not reward, except at its peril, the lawless because the passage of time has made correction inexpedient."

*In re Adoption No. 10087 in Circuit Court for Montgomery Cnty.*, 324 Md. 394, 410–11 (1991) (quoting *Bennett v. Jeffreys,* 356 N.E.2d 277, 284 (N.Y. 1976)). This Court has echoed that sentiment when construing Maryland's jurisdiction under the Maryland UCCJEA. In *Malik* we recognized: "It is difficult to quarrel with the proposition that '[t]he effect of assuming jurisdiction to determine child custody after there has been a wrongful taking or detention may be the encouragement of child snatching.'" 99 Md. App. at 531 (citations and quotations omitted). Worse yet, the further the parent flees or more surreptitiously they behave, the more likely they are to achieve the six-month threshold.

15

Then in 1997, the National Conference of Commissioners of Uniform State Laws ("NCCUSL") promulgated the model UCCJEA ("Model UCCJEA" or "Model Act") "to revise the UCCJA in order to coincide with federal enactments[, such as the Parental Kidnapping Prevention Act,] and to resolve the consequent thirty years of conflicting case law caused by states' various enactments of the UCCJA." *Friedetzky v. Hsia*, 223 Md. App. 723, 734 (2015). The Model Act perpetuates the UCCJA's objectives of deterring parents from removing their children from a jurisdiction without consent. *See, e.g.*, *Cabrera*, slip op. at 32 (quoting Model Act, § 101 cmt., 9 U.L.A. Part 1A, at 657 (1997) (hereinafter "9 U.L.A.") ("A chief function of the [Model UCCJEA] is to 'deter abductions of children.'")). The NCCUSL's comments to the Model UCCJEA suggest that courts interpret the Model Act "according to its purposes, which are to:"

(1) Avoid jurisdictional competition and conflict with the courts of other States and in matters of child custody which have in the past resulted in the shifting of children from State to State with harmful effects on their well-being;
(2) Promote cooperation with the courts of other States to the end that a custody decree is rendered in that State which can best decide the case in the interest of the child;
(3) Discourage the use of the interstate system for continuing controversies over child custody;
**(4) Deter abductions of children;**
(5) Avoid litigation of custody decisions of other States in this State;
**(6) Facilitate the enforcement of custody decrees of other States.**

9 U.L.A. § 101 cmt. (1997) (emphasis added).

16

## 2. Jurisdiction under the Act

The Maryland UCCJEA instructs us to decide child custody cases in the child's best interest and with an eye toward disincentivizing the unlawful movement of children across state borders, *see* 9 U.L.A. § 101 cmt., and to effectuate these ends, the Act imposes limits on the courts' traditional subject matter jurisdiction to issue orders affecting a resident-parent's custody rights. *See, e.g.*, FL §§ 9.5-201, 9.5-203, 9.5-207, 9.5-208; *see also Harris v. Melnick*, 314 Md. 539, 548 (1989) (quoting Brigitte M. Bodenheimer, *Interstate Custody: Initial Jurisdiction and Continuing Jurisdiction Under the UCCJA*, 14 Fam. L. Q. 203, 213-14 (1981) ("[C]oncurrent jurisdiction in several states to modify an existing custody judgment was a major cause of parental resort to kidnapping to gain a more favorable judgment in a new forum.")).

The Maryland UCCJEA's key jurisdictional provisions are enumerated in FL §§ 9.5-201 - 9.5-204. These provisions control when a state confronted with a custody action may exercise initial jurisdiction, FL § 9.5-201; exclusive, continuing jurisdiction, FL § 9.5-202; jurisdiction to modify an existing custody order, FL § 9.5-203; and temporary emergency jurisdiction, FL § 9.5-204.

The Maryland UCCJEA's jurisdictional rules restrict a state's subject matter jurisdiction even more severely when, as here, another state has previously issued a custody order. The Act prohibits concurrent jurisdiction between two states to limit the occurrence of different states creating competing custody awards. *Melnick*, 314 Md. at 550 (citations and quotations omitted) ("The rule is clear and simple. There can be no concurrent

jurisdiction and no jurisdictional conflict between two states."). Additionally, the Maryland UCCJEA discourages states from exercising jurisdiction when they are not the most convenient forum, FL § 9.5-207; or, when a parent has engaged in "unjustifiable conduct." FL § 9.5-208. Just as the authority to make an initial custody determination is exclusive to a single state, only a single state may possess authority to modify an existing custody determination. *See Melnick*, 314 Md. at 551-52.

### 3. Applying The Maryland Act

At first glance, this case presents a seeming conflict between the Maryland UCCJEA's purpose of protecting parents from the unjustifiable taking of their children and the jurisdictional limitation the Act employs to accomplish that purpose. The circuit court here determined that Ms. Pilkington's continued behavior dictated that the cessation of her custody rights was in R.P.'s best interest, and awarded Mr. Pilkington, a Maryland resident, full legal custody of R.P. Ms. Pilkington now challenges the circuit court's authority to issue that order, arguing that the Maryland UCCJEA bars Maryland from exercising subject matter jurisdiction to protect the custody rights of a Maryland resident.

We recognize that allowing Ms. Pilkington to challenge the underlying order can be viewed as rewarding her attempts to deceive her co-parent and evade the rule of law. The Maryland UCCJEA's very purpose is to prevent parents from obtaining favorable custody decisions by unilaterally moving their child to a new jurisdiction, and now Ms. Pilkington relies on the statute's home state provision meant to prohibit such conduct. But our role is to say what the law is. "In deciding this case, we must not succumb to the allure of bad

18

facts for their tendency to create bad law." *Espina v. Jackson*, 442 Md. 311, 317 (2015); *cf.* Brigitte M. Bodenheimer, *The Rights of Children and the Crisis in Custody Litigation: Modification of Custody In and Out of State*, 46 U. Colo. L. Rev. 495, 503 (1975) [hereinafter "Bodenheimer II"] ("There are, to be sure, some hard cases under the [Model UCCJEA] which will tax to the utmost a court's ability to apply the [Model Act].").

In construing the Maryland UCCJEA's jurisdictional provisions, we recognize that our discretion to interpret statutes is not unbound and that "[t]he cardinal rule of statutory construction is to ascertain and effectuate the intentions of the legislature." *Rockwood Cas. Ins. Co. v. Uninsured Employers' Fund*, 385 Md. 99, 108 (2005) (citation omitted). "If the words of the statute, construed according to their common and every day meaning, are clear and unambiguous and express a plain meaning, we will give effect to the statute as it is written." *Jones v. State*, 336 Md. 255, 261 (1994). Our goal is to give statutes their "most reasonable interpretation, in accord with logic and common sense, and to avoid a construction not otherwise evident by the words actually used." *Greco v. State*, 347 Md. 423, 429 (1997).

### C. Maryland's Jurisdiction over R.P.

Our primary obligation is to determine whether Maryland has jurisdiction over this custody dispute. *Malik*, 99 Md. App. at 526 (citation omitted) ("When presented with a jurisdictional conflict in a child custody case, the court must . . . FIRST . . . ascertain whether it has jurisdiction."). The Maryland judiciary may only exercise its authority in cases over which it has both personal and subject matter jurisdiction. *Himes Associates,*

19

*Ltd. v. Anderson*, 178 Md. App. 504, 526 (2008); *Lewis v. Murshid*, 147 Md. App. 199, 202-03 (2002). Personal jurisdiction is not at issue in the instant action because the father resides in Maryland and the mother appeared by counsel to contest the action without objecting to the court's personal jurisdiction, thus waiving her right to do so on appeal. *See* Md. Rule 2-322(a); Md. Rule 8-131(a); *McCormick v. St. Francis de Sales Church*, 219 Md. 422, 429 (1959) (holding that a party's general appearance waives the right to contest the court's lack of personal jurisdiction). We proceed then to appraise subject matter jurisdiction.

The statutory authority for the court's exercise of subject matter jurisdiction over this action was not specified in the circuit court's ruling from the bench at the September 24, 2015 emergency hearing; or the court's order following that hearing; or the magistrate's December 30, 2015 report and recommendation; or the circuit court's custody order dated January 13, 2016. Consequently, it is what Mr. Pilkington pleaded and what the parties discussed during their colloquies with the court that drive our examination of the following provisions of the Maryland UCCJEA: (1) temporary emergency jurisdiction under FL § 9.5-204; (2) exclusive jurisdiction to modify a custody order under FL § 9.5-203; and (3) the duty to enforce a sister state's valid custody order and visitation schedule under FL §§ 9.5-303, 9.5-304.

We review *de novo* whether a trial court interpreted a jurisdictional statute correctly. *Cabrera*, slip op. at 38-39.

### 1. Temporary Emergency Jurisdiction

Mr. Pilkington's emergency custody motion first asked the circuit court to assume jurisdiction under FL § 9.5-204(a), which permits a court to exercise temporary emergency jurisdiction over a custody action "if the child is present in this State and the child has been abandoned or it is necessary in an emergency to protect the child because the child, or a sibling or parent of the child, is subjected to or threatened with mistreatment or abuse." *Id.* Mr. Pilkington urged the court to exercise temporary jurisdiction to uphold the Maryland UCCJEA's policies. He argued that the circumstances warranted temporary emergency relief, alleging that a German official had previously questioned the legality of R.P. remaining in Germany for a period longer than 120 days on an American passport and that allowing him to return to Germany would subject him to unnecessary detention by German customs officials. Ms. Pilkington responds that the circuit court could not have premised its relief on FL § 9.5-204, because its order was not temporally limited and because that subsection requires the lower court to communicate its order with the home state immediately.

The Maryland UCCJEA considers an emergency to include "mistreatment or abuse." FL § 9.5-204. This Court has explained that this "requires some actual injury or substantially probable threat to the victim's physical or mental welfare." *Kalman v. Fuste*, 207 Md. App. 389, 405 (2012). "[T]here is no indication that flight *alone* is a risk or harm contemplated by FL § 9.5-204." *Id.* at 409 n.13 (emphasis in original).

21

First and foremost, there is no indication that the circuit court accepted Mr. Pilkington's argument that returning R.P. to his mother carried with it the risk that German officials would detain R.P. The court did not seem convinced that R.P., having been born in Germany to a German mother, was not a German citizen. And, as Mr. Pilkington concedes, R.P. "[wa]s not threatened with mistreatment or abuse." The general public policy considerations on which he asked the court to rely did not create temporary emergency jurisdiction under the Maryland UCCJEA.

Second, Ms. Pilkington is mostly correct that the circuit court's procedure and order indicate that its assertion of jurisdiction was consistent with FL § 9.5-204. Because the Colorado Order governed Mr. and Ms. Pilkington's custody rights with respect to R.P., Mr. Pilkington's action was for the modification of an already existing order. Subsection (c) of FL § 9.5-204 governs temporary jurisdiction over actions involving "[p]revious child custody determinations," requires that "any order issued by a court of this State . . . shall specify in the order a period that the court considers adequate to allow the person seeking an order to obtain an order from the state having jurisdiction under §§ 9.5-201 through 9.5-203 of this subtitle." FL § 9.5-204(c)(1). That temporary order's effect is then limited "until an order is obtained from the state" having initial, continuing, or modification jurisdiction under §§ 9.5-201 through 9.5-203 of this subtitle. FL § 9.5-204(c)(2). But, as we next explain in more detail, Colorado lacked continuing jurisdiction so Ms. Pilkington is incorrect in her assertion that § 9.5-204(d) required the circuit court to immediately contact the Colorado court. With that being said, however, the circuit court's actions—

22

awarding sole legal and primary physical custody to Mr. Pilkington—takes the court's action outside the provisions for temporary jurisdiction under FL § 9.5-204.

## 2. Jurisdiction to Modify a Custody Order

As discussed *supra,* Mr. Pilkington's action was for the enforcement of the Colorado Order—an already existing custody order that another jurisdiction issued. However, rather than enforce the existing order, the circuit court granted Mr. Pilkington sole custody of R.P., thereby modifying the Colorado Order and implicating FL § 9.5-203, which provides the court "[j]urisdiction to modify determination[s]." FL § 9.5-203.

Ms. Pilkington argues on appeal that Germany was R.P.'s home state under the Maryland UCCJEA at the time Mr. Pilkington filed the underlying action. According to Ms. Pilkington, this means that the circuit court erred by asserting jurisdiction concurrently—which the Maryland UCCJEA prohibits—and impermissibly modifying the Colorado Order without involving Colorado or Germany.

When a parent or guardian brings an action in Maryland for the custody or visitation of a child and another state has already issued an operable custody order, the Maryland UCCJEA limits the circumstances in which a Maryland court may assert jurisdiction to modify that existing custody order. "Courts generally give the decree-rendering state a strong presumption of continuing modification jurisdiction until all or almost all connection with the parents and the child is lost." *Melnick*, *supra*, 314 Md. at 554 (citations omitted). Once both parents and the child have left the decree-rendering state, however, "deference to the jurisdiction of the original court [is] no longer appropriate." *Id.* (citation

23

and quotations omitted).  Still, the Maryland court must then determine whether Maryland

is the proper state to exercise modification jurisdiction under the Maryland UCCJEA.

Section 9.5-203 governs Maryland courts' jurisdiction to modify an existing

custody order.  It provides:

> [A] court of this State may not modify a child custody determination made by a court of another state unless a court of this State *has jurisdiction to make an initial determination under § 9.5-201(a)(1) or (2) of this subtitle* **and:**
>> (1) the court of the other state determines it no longer has exclusive, continuing jurisdiction under § 9.5-202 of this subtitle or that a court of this State would be a more convenient forum under § 9.5-207 of this subtitle; or
>> (2) a court of this State or a court of the other state determines that the child, the child's parents, and any person acting as a parent do not presently reside in the other state.

FL § 9.5-203 (emphasis added).

The statute thus establishes the threshold determination is whether Maryland has

jurisdiction to make an initial determination under FL § 9.5-201(a)(1) or (2) , which allow

for jurisdiction "only if:"

> (1) this State is the home state of the child on the date of the commencement of the proceeding, or was the home state of the child within 6 months before the commencement of the proceeding and the child is absent from this State but a parent or person acting as parent continues to live in this State;
> (2) a court of another state does not have jurisdiction under item (1) of this subsection, or a court of the home state of the child has declined to exercise jurisdiction on the ground that this State is the more appropriate forum under § 9.5-207 or § 9.5-208 of this subtitle, and:
>> (i)  the child and the child's parents, or the child and at least one parent or a person acting as a parent, have a significant connection with this State other than mere physical presence; and
>> (ii) substantial evidence is available in this State concerning the child's care, protection, training, and personal relationships[.]

FL § 9.5-201(a)(1)-(2).

### i. R.P.'s Home State

Ms. Pilkington argues that Germany was R.P.'s home state because he lived there for more than six months prior to Mr. Pilkington's commencement of the underlying action and the Maryland UCCJEA treats foreign countries as states for the purposes of the subtitles that define home state and establish jurisdiction. The Maryland UCCJEA defines "home state" as "the state in which a child lived with a parent or a person acting as a parent for at least 6 consecutive months, including any temporary absence, immediately before the commencement of a child custody proceeding[.]" FL §9.5-101(h)(1).

Here, it is clear that Maryland was not R.P.'s home state because he was only in Maryland for about three months before his father instituted the underlying action. Because those three months fall far short of the six months that the Maryland UCCJEA requires, R.P.'s stay in Maryland for summer vacation did not render Maryland the home state under FL § 9.5-201(a)(1). That means we must evaluate jurisdiction under FL §§ 9.5-201(a)(2) and determine whether, if not Colorado, another jurisdiction qualified as R.P.'s home state.

After Ms. Pilkington challenged the court's subject matter jurisdiction at the motion's hearing, the court engaged the parties in the following colloquy:

> THE COURT: I'm looking at the Colorado Parent Plan. [Ms. Pilkington] never filed a motion with the Colorado court to relocate to Germany?

[MS. PILKINGTON'S COUNSEL]: No, she did not, Your Honor, and nor has this Colorado Order ever been enrolled in Maryland.

THE COURT: I assume that that will happen shortly?

[MR. PILKINGTON'S COUNSEL]: Due to the home [state] issue of six months, I was going to file that in December when that time comes.

THE COURT: That's the problem that I have with mom is that she didn't follow the Order from Colorado. Certainly with her being a German nat[ional] it certainly is foreseeable that she would go back to where her family is with the child, but we have a provision in [the Colorado Order] that somebody checked off[:] neither father nor mother have current plans to relocate with the child.

* * *

[MR. PILKINGTON'S COUNSEL]: I didn't know if Your Honor needed any additional information about the statutory law on this as far as, even if Your Honor finds that Maryland doesn't have jurisdiction, they can still enforce [the Colorado Order].

THE COURT: I'm finding that we do [have jurisdiction].

* * *

Under the [Maryland UCCJEA] – Once again, if we didn't have that little intercession in Germany for over a year, clearly we wouldn't and I would tell you all to pack your bags and go see beautiful Colorado.

* * *

But we do have that. So, if you look at what state in the union has any [jurisdiction], there is really no longer one that is clear. We look at the contacts with this state and at this point in time you still have two states fighting for it, one is Colorado under a continuing jurisdiction aspect and it is their Order, et cetera, but nobody has been there for over a year. Nobody has been here for long. The end of June and three months is all we have. So, it isn't terrific contact, but it certainly seems to beat anybody else in the USA. So, I'm not concerned on a jurisdictional aspect.

The circuit court focused on two factual circumstances in concluding that R.P. had no home state: (1) Ms. Pilkington violated the Colorado Order by taking R.P. to Germany; and (2) at the time of the hearing, R.P. had not lived in any state in the United States for over a year. We shall examine each consideration.

## ii. Foreign Countries under the Maryland UCCJEA

Section 9.5-104 of the Maryland UCCJEA instructs that "[a] court of this State shall treat a foreign country as if it were a state of the United States for the purpose of applying Subtitles 1 and 2 of this title." FL § 9.5-104(a). Subtitle 1 includes the Maryland UCCJEA's definition of home state. *See* FL § 9.5-101(h). Subtitle 2 includes the Maryland UCCJEA's jurisdictional provisions. *See* FL §§ 9.5-201 – 9.5-204. Consistent with these provisions, this Court explained in *Garg v. Garg* that "the plain meaning of the [Maryland] UCCJEA makes clear that the term 'state' applies to foreign nations[.]" 163 Md. App. 546, 594 (2005), *rev'd on other grounds*, 393 Md. 225 (2006). Thus, Ms. Pilkington is correct in her assertion that the Maryland UCCJEA required the circuit court to treat Germany as if it were a state for the purposes of determining home state jurisdiction.

Ms. Pilkington took R.P. to Germany on January 25, 2014, and the child remained there with her until June 2015—far exceeding the six consecutive months that the Maryland UCCJEA's home state provision requires. *See* FL § 9.5-101(h). Based on the record before

27

us, therefore, Germany became R.P.'s home state on or about July 26, 2014.[10] To the extent the circuit court determined that R.P. had no home state because Germany was not a state, its decision was legally incorrect.

### iii.    Unlawful Conduct and Establishing Home State

As the court concluded that R.P. had no home state, it also commented on the fact that R.P. resided in Germany for more than six months because Ms. Pilkington failed to abide by the Colorado Order's express limitations on either parent's right to relocate R.P. unilaterally. Ms. Pilkington does not address the reason R.P. came to spend over a year in Germany, but it gives us pause.

Ms. Pilkington removed the child from his home state of Colorado under the auspices of Mr. Pilkington's signed letter—the explicit terms of which only granted Ms. Pilkington the right to remain in Germany with R.P. until February 20, 2014. Rather than returning with R.P., Ms. Pilkington decided unilaterally to keep the child in Germany, estranged from his father. She did this in contravention of Mr. Pilkington's parental rights under the Colorado Order, which required Ms. Pilkington to seek Mr. Pilkington's permission for all out-of-state overnight travel and to seek the custody court's permission

---

[10] There is an argument that the "home state" clock would not have begun to run during R.P.'s first month in Germany since he was purportedly there on vacation, which could constitute a temporary absence from Colorado instead of establishing a new home state. *Cf. Drexler v. Bornman*, 217 Md. App. at 362 (applying a "totality of the circumstances" test to determine whether a child's absence is considered "temporary" under the Maryland UCCJEA). That point, however, is moot because Mr. Pilkington waited nineteen months to initiate suit.

28

to relocate the child's residence to anywhere that would "substantially change[]" "the geographic ties between the child[] and the other parent."

Although the Maryland UCCJEA permits us to decline jurisdiction based on a parent's unlawful behavior, *see Malik*, 99 Md. App. at 532 (quoting *Stevens v. Stevens*, 425 A.2d 1081, 1084 (N.J. Super. Ct. App. Div. 1981) ("Since the only . . . basis for jurisdiction in the [trial court] was established by the plaintiff removing [the child] by taking him from the babysitter, if the trial court had entertained this action it would have frustrated the very purpose of [the UCCJA].")), we have no similar ability to expand our jurisdiction on that basis.

In *Malik*, this Court confronted a similar set of circumstances and found that home state jurisdiction existed. There, a mother fled Pakistan, the country in which she lived with her child, and resettled in Maryland. 99 Md. App. at 524. By the time the father tracked the mother to Maryland, she had already resided here with the child for longer than six months. *Id.* After acknowledging that allowing a parent to create jurisdiction through her unlawful behavior would create poor incentives, the court determined that the child's time in Maryland satisfied the UCCJA's home state provision. *Id.* at 529-33.

Eleven years later, we followed up on the point. In *Garg v. Garg*, this Court explained: "*Malik* makes clear that[] even if a child is improperly removed to Maryland, in violation of a court order, Maryland may still become a 'home state.'" 163 Md. App. at 599 (internal citations omitted). *Garg* continued: "We have found no support in the UCCJA for the court's determination that home state jurisdiction is lost when a child has

29

been impermissibly removed from one jurisdiction to another." *Id.* Instead, it is solely within the home state's discretion to decline jurisdiction based on the resident-parent's unjustifiable conduct. "The Maryland [UCCJEA] does not authorize a Maryland circuit court to decline jurisdiction on the [home state's] behalf." *Toland v. Futagi*, 425 Md. 365, 387-88 (2012).

Returning to the case on appeal, Mr. Pilkington did not ask a court to intervene until R.P. had already resided in Germany for roughly nineteen months.[11] That period more than satisfies FL § 9.5-101(h)'s straight-forward definition that a child's "home state" is "the state in which [the] child lived with a parent or person acting as a parent for at least 6 consecutive months, including any temporary absence, immediately before the commencement of a child custody proceeding." *Id.*

In sum, we conclude the circumstances presented in this case do not provide a basis under the Maryland UCCJEA for jurisdiction to modify a foreign custody order. According to FL § 9.5-203, "a court of this State may not modify a child custody determination made by a court of another state unless a court of this State has jurisdiction to make an initial determination under § 9.5-201(a)(1) or (2) of this subtitle[.]" The record demonstrates that Maryland is not the home state under § 9.5-201(a)(1), and, our analysis under § 9.5-201(a)(2)—("a court of another state does not have jurisdiction under item (1) of this subsection, . . .")—stops short once we determine that Germany was R.P.'s home

---

[11] This total includes January 2014 through August 2015 when Mr. Pilkington initiated proceedings in the circuit court.

30

state at the time of the hearing in this case. Accordingly, we hold that the circuit court erred when it modified the Colorado Order.

### 3. Duty to Enforce a Foreign Custody Determination

#### i. Subject Matter Jurisdiction

Our conclusion that the circuit court's modification of the Colorado Order exceeded the restraints that Subtitle 2 imposed on its subject matter jurisdiction does not, however, necessarily dispose of the underlying action. Apparently recognizing the limitations on the court's authority to modify a foreign custody order under the Maryland UCCJEA, Mr. Pilkington, quoting from FL § 9.5-303, requested the court "recognize and enforce a child custody determination of a court of another state."[12] Consequently, upon remand, the circuit court must limit itself to the enforcement authority enumerated in Subtitle 3 of the Maryland UCCJEA.[13]

As this Court noted in *Kalman*, *supra*, the Maryland UCCJEA "introduces some jurisdictional confusion by making positive assertions as to when 'subject matter jurisdiction' does (or does not) exist based solely on the [Maryland] UCCJEA itself." 207

---

[12] At the emergency hearing, Mr. Pilkington's counsel reiterated: "I didn't know if Your Honor needed any additional information about the statutory law on this as far as, even if Your Honor finds that Maryland doesn't have jurisdiction, they can still enforce that [Colorado Order]."

[13] Courts must ensure that subject matter jurisdiction exists over a case at all points of the litigation and may raise the issue, "sua sponte, at any time." *Murshid*, 147 Md. App. at 202–03 (2002).

Md. App. at 399 n.5. "'[J]urisdiction' encompasses different meanings depending upon the context in which it is being used." *Pulley v. State*, 287 Md. 406, 415 (1980). "[I]t may, but does not necessarily always, refer to the 'fundamental jurisdiction' of a court, i.e., 'the power residing in [a] court to determine judicially a given action, controversy, or question presented to it for decision.'" *Id.* (quoting *Fooks' Executors v. Ghingher*, 172 Md. 612, 621 (1937). By fundamental jurisdiction, we mean "the power to act with regard to a subject matter which 'is conferred by the sovereign authority which organizes the court, and is to be sought for in the general nature of its powers, or in authority specially conferred.'" *Id.* at 416 (quoting *Cooper v. Reynolds' Lessee*, 77 U.S. (10 Wall.) 308, 316 (1870)). *See also Murshid*, *supra*, 174 Md. App. at 205-06 (holding that a circuit court erred when it dismissed a parent's claim for recognition and enforcement of a foreign order because Maryland lacked original and modification jurisdiction under the UCCJA).

In other words, the legislative restriction on the courts' authority to issue certain orders in certain types of cases is not necessarily coextensive with a prohibition on the courts' ability and competence to hear and consider those cases to begin with. Consider, for instance, the Parental Kidnaping Prevention Act, the federal corollary to the Model UCCJEA. Like the Model Act, the Parental Kidnaping Prevention Act "'seems to refer to a federal statutory grant of jurisdiction to state courts[.]'" *Rogers v. Platt*, 814 F.2d 683, 684 n.1 (D.C. Cir. 1987) (quoting *Parental Kidnaping Prevention Act of 1979: Joint Hearing on S.105 Before the Subcomm. On Criminal Justice of the Senate Comm. On the Judiciary and the Subcomm. On Child and Human Development of the Senate Comm. On*

32

*Labor and Human Resources*, 96th Cong., 2d Sess. 151 n.34 (1980) (statement of Professor Russell M. Coombs). "[T]hey of course do not mean that," *id.*, because the Parental Kidnaping Prevention Act cannot actually limit the state courts' jurisdiction. Instead, the statute's jurisdictional terms "are merely economical expressions referring to the conditions under which [arises a] federal statutory duty to enforce and not modify a custody determination[.]'" *Id.* The same is true here.

The circuit courts of Maryland are courts of general jurisdiction with several sources of subject matter jurisdiction independent of those enumerated in Subtitle 2 of the Maryland UCCJEA. *See* Maryland Code (1973, 2013 Repl. Vol.), Courts and Judicial Proceedings Article ("CJP") § 1-501.[14] Reading the Maryland UCCJEA's jurisdictional provisions as a bar on the circuit court's authority to consider a custody dispute runs counter to one of the Model Act's main purposes: "facilitat[ing] *the enforcement* of custody decrees of others States[.]" 9 U.L.A. § 101 cmt. (emphasis added). In fact, Professor Brigitte M. Bodenheimer, the Model Act's reporter, explained that "the jurisdictional provision of the [Model] Act is of far less practical importance than the recognition, enforcement, and nonmodification provisions." Bodenheimer II, *supra*, at 503. We

---

[14] CJP § 1-501 provides:

The circuit courts are the highest common-law and equity courts of record exercising original jurisdiction within the State. Each has full common-law and equity powers and jurisdiction in all civil and criminal cases within its county, and all the additional powers and jurisdiction conferred by the Constitution and by law, except where by law jurisdiction has been limited or conferred exclusively upon another tribunal.

examine, then, the alternative means by which the circuit court may have granted Mr. Pilkington relief.

### ii. The Maryland UCCJEA's Enforcement Provisions

In addition to asking the court for temporary emergency relief under FL § 9.5-204 (which we have addressed in section C.1 of this opinion), Mr. Pilkington sought relief pursuant to the court's enforcement powers under FL §§ 9.5-303 and 9.5-304 of the Maryland UCCJEA. Ms. Pilkington argues briefly that FL § 9.5-304 limits the circuit court's authority to issuing temporary orders and the circuit court erred by not complying with the Maryland UCCJEA's guidelines for the issuance of temporary orders. She also seems to suggest that the circuit court erred by enforcing the Colorado Order because Mr. Pilkington had not registered that order in Maryland.

Subtitle 3 of the Maryland UCCJEA contains the enforcement provisions, which impose on Maryland courts a duty to enforce foreign custody orders, FL § 9.5-303; allow Maryland courts to temporarily enforce visitation rights, FL § 9.5-304; allow parents or guardians to register a foreign state's custody determinations in Maryland, FL § 9.5-305; and permit Maryland courts to enforce any registered foreign judgment as if a Maryland court issued the initial order, FL § 9.5-306.

### a. Temporary Visitation Enforcement

Similar to her argument concerning the circuit court's temporary emergency jurisdiction under FL § 9.5-204, *supra*, Section C.1, Ms. Pilkington contends that FL § 9.5-

304 places temporal limits on the court's visitation orders and requires the court to specify how long its order will remain in effect.

Section 9.5-304 states:

(a) A court of this State that does not have jurisdiction to modify a child custody determination may issue a temporary order enforcing:
(1) a visitation schedule made by a court of another state; or
(2) the visitation provisions of a child custody determination of another state that does not provide for a specific visitation schedule.

(b) (1) If a court of this State makes an order under subsection (a)(2) of this section, it shall specify in the order a period that it considers adequate to allow the petitioner to obtain an order from a court having jurisdiction under the criteria specified in Subtitle 2 of this title.
(2) The order remains in effect until an order is obtained from the other court or the period expires.

FL § 9.5-304.

It is clear from this text that Ms. Pilkington is correct that FL § 9.5-304 requires the court's order to include specific temporal limits on the order's effect—something the underlying order granting sole legal and primary physical custody to Mr. Pilkington did not do. Regardless, because the Colorado Order contained a visitation schedule, temporary visitation enforcement would be confined to the terms of the Colorado Order under FL § 9.5-304(a)(1).

**b. Enforcing Foreign Orders in Maryland**

Ms. Pilkington also argues that the circuit court could not enforce the Colorado Order because Mr. Pilkington did not register that order in Maryland. She is incorrect.

35

Subsection 9.5-303 imposes on Maryland courts a "[d]uty to enforce" foreign custody determinations if the issuing court exercised jurisdiction in conformity to the Maryland UCCJEA:

### Recognition and enforcement of out-of-state determination

(a) A court of this State *shall* recognize and enforce a child custody determination of a court of another state *if* the latter court exercised jurisdiction in substantial conformity with this title or the determination was made under factual circumstances meeting the jurisdictional standards of [the Maryland UCCJEA] and the determination has not been modified in accordance with [the Maryland UCCJEA].

### Remedies available to enforce child custody

(b) (1) A court of this State may utilize any remedy available under other laws of this State to enforce a child custody determination made by a court of another state.
(2) The remedies provided in this subtitle are cumulative and do not affect the availability of other remedies to enforce a child custody determination.

(Emphasis added). The NCCUSL's comments to § 303 of the Model Act explain that "a custody determination of another State will be enforced in the same manner as a custody determination made by a court of this State[,]" using "[w]hatever remedies are available to enforce a local determination." 9 U.L.A. § 303, cmt.

Ms. Pilkington does not specify the statutory provision upon which her argument rests, but it appears she is saying the court may not exercise its non-discretionary FL § 9.5-303 duty to enforce unless a party has registered the foreign custody judgment in Maryland. We disagree.

36

The Maryland UCCJEA contains two separate enforcement provisions: FL §§ 9.5-303 and 306. The latter provision, FL § 9.5-306,[15] provides for the enforcement of registered orders and works in conjunction with FL § 9.5-305, which governs the registration of foreign custody orders. FL § 9.5-303, on the other hand, makes no mention of registration. The logical inference that follows this distinction is that the court's general duty to enforce foreign custody determinations, enumerated in FL § 9.5-303, does not require the party to have previously registered the foreign order. Ms. Pilkington's suggested reading would render superfluous FL § 9.5-306, and we must "construe the statute as a whole so that no word, clause, sentence, or phrase is rendered surplusage, superfluous, meaningless, or nugatory." *Dep't of Health & Mental Hygiene v. Kelly*, 397 Md. 399, 420 (2007) (citations omitted).

Once again, the NCCUSL's comments are insightful to reinforce this point. The comment to the provision for registration of foreign custody orders (Model UCCJEA § 305), explains that the "simple registration procedure . . . can be used to predetermine the enforceability of a custody determination[,]" and "should be . . . an aid to pro se litigants[,]" as well as foreign custodial parents. 9 U.L.A. § 305, cmt. The drafters envisioned a

---

[15] In full, FL § 9.5-306 states:

(a) A court of this State may grant any relief normally available under the law of this State to enforce a registered child custody determination made by a court of another state.
(b) A court of this State shall recognize and enforce, but may not modify, except in accordance with Subtitle 2 of this title, a registered child custody determination of a court of another state.

situation where a foreign parent uses the registration process to pre-determine that a jurisdiction will recognize a foreign custody order "before ever sending the child to the United States for visitation"—let alone before the filing of an enforcement action. *See id.* Registering a custody order may save costs and simplify litigation. A parent cannot challenge the validity of a properly registered foreign order during an action for enforcement under FL 9.5-306[16] because FL § 9.5-305 "precludes further contest of that order with respect to any matter that could have been asserted at the time of registration." In sum, there is no indication in the Act's language or the drafter's comments that registration is mandatory, and consequently, in the instant case, the failure to register alone would not have barred the court's enforcement authority under FL § 9.5-303.

We recognize, however, that, as with many cases of this nature, it may be that Maryland is not the best state to enforce the Colorado Order. There certainly are practical impediments to enforcement of the Colorado Order in Maryland. Yet, we make the following observations for guidance should Mr. Pilkington pursue his claim further upon remand. As we have established, the Maryland Court is limited to enforcing the terms of the Colorado Order. That order provides, *inter alia*, that Mr. Pilkington's custody of R.P. is limited to 170 days per year—giving Mr. Pilkington the benefit of the internal calculation error in the Colorado Order (100 days or 170). This means that under the Colorado Order, Mr. Pilkington is not entitled to custody of R.P. for a period of time sufficient to confer

---

[16] FL 9.5-306 (a) provides that a court "may grant any relief normally available under the law of this State to enforce a registered custody determination[.]"

home state jurisdiction in Maryland (180 days). The circuit court below, therefore, did not err in returning R.P. to the home state of Germany. Assuming R.P. is still in Germany, we further recognize the practical constraints on the circuit court's enforcement authority. However, this opinion does not preclude, on remand, consideration of any evidence of changed circumstances that tend to establish jurisdiction in Maryland under Subtitle 2 (e.g., Germany is no longer the home state, FL § 9.5-203; Germany has exercised its discretion not to assert jurisdiction based on Ms. Pilkington's conduct, FL § 9.5-208; Germany has decided that Maryland is a more convenient forum, FL § 9.5-207; or an emergency exists that would establish temporary emergency jurisdiction, FL § 9.5-204).

## D. Appellant's Remaining Claims

Because we have vacated the circuit court's order modifying the parties' custody rights, we need not address Ms. Pilkington's three remaining claims concerning the propriety of that order.

**ORDER MODIFYING CUSTODY VACATED. CASE REMANDED TO THE CIRCUIT COURT FOR HARFORD COUNTY FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. EACH PARTY TO PAY THEIR OWN COSTS.**